13-3416-cv, 13-3501-cv
Sompo Japan v. Norfolk So. Railway, Nipponkoa Ins. v. Norfolk So. Railway

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: May 9, 2014    Decided: August 6, 2014)

Docket Nos. 13-3416-cv, 13-3501-cv

SOMPO JAPAN INSURANCE COMPANY OF AMERICA,

*Plaintiff-Appellant,*

— v. —

NORFOLK SOUTHERN RAILWAY COMPANY, NORFOLK SOUTHERN CORPORATION, THE KANSAS CITY SOUTHERN RAILWAY COMPANY,

*Defendants-Appellees.*[*]

NIPPONKOA INSURANCE COMPANY

*Plaintiff-Appellee,*

— v. —

---

[*] The clerk of court is respectfully directed to conform the caption to that shown above.

NORFOLK SOUTHERN RAILWAY COMPANY, THE KANSAS CITY SOUTHERN RAILWAY COMPANY,

*Defendants-Appellants.*

————————————

B e f o r e:

JACOBS, SACK, and LYNCH, *Circuit Judges*.

————————————

DAVID T. MALOOF (Thomas M. Eagan, *on the brief*), Maloof Browne & Eagan LLC, Rye, New York, *for* Plaintiff-Appellant Sompo Japan Insurance Company of America in No. 13-1416, and *for* Plaintiff-Appellee Nipponkoa Insurance Company in No. 13-3501.

PAUL D. KEENAN, Keenan Cohen & Howard P.C., Jenkintown, Pennsylvania, *for* Defendants-Appellants Norfolk Southern Railway Company and The Kansas City Southern Railway Company in No. 13-3501, and *for* Defendants-Appellees Norfolk Southern Railway Company, Norfolk Southern Corporation, and The Kansas City Southern Railway Company in No. 13-3416.

————————————

These appeals from the United States District Court for the Southern District of New York (Denny Chin, *Judge*), heard in tandem, arise out of a train derailment in the United States and the resulting damage to the train's cargo.

2

The cargo in question originated in parts of Asia and was destined for various recipients in the United States. Both appeals raise questions about the interpretation and enforceability of a provision contained in a through bill of lading issued by an upstream ocean carrier that purportedly designates the upstream carrier as the sole entity responsible to the cargo owners for damage to the cargo, thereby relieving the railroads from liability to the cargo owners. In addition, the appeal in <u>Nipponkoa Insurance Co. v. Norfolk Southern Railway</u> challenges Nipponkoa's ability to maintain its claim for contractual indemnification – a claim assigned to it by the upstream ocean carrier – against Norfolk Southern and the Kansas City Southern Railway Company. We affirm the judgment of the district court in both appeals. The defendants are entitled to enforce the liability-limiting provision in the upstream carrier's bill of lading against the plaintiffs. However, the judgment in favor of Nipponkoa is sustained because the defendants' challenges to that judgment were waived below.

AFFIRMED.

_____

GERARD E. LYNCH, *Circuit Judge*:

In April 2006, a train derailed near Dallas, Texas, destroying much of the

train's cargo – a variety of manufactured goods ranging from tractors to copy machines. The derailment precipitated these actions, which are on appeal before this Court for the second time. Before taking their fateful train ride, the manufactured goods had traveled across the Pacific Ocean from various parts of Asia. Their entire international journey was governed by through bills of lading – essentially, contracts – issued by ocean carriers to the cargo owners or their intermediaries. In the aftermath of the derailment, the plaintiffs Sompo Japan Insurance Company of America ("Sompo") and Nipponkoa Insurance Company ("Nipponkoa") (collectively, "plaintiffs") – subrogees of the cargo owners/shippers – filed suit against Norfolk Southern Railway Company, Norfolk Southern Corporation (together, "Norfolk Southern"),[1] and the Kansas City Southern Railway Company ("KCSR") (collectively, "defendants" or "the Railroads") to recover for the damage sustained to the cargo by the derailment.

The litigation was originally pursued based on plaintiffs' federal causes of action under the framework of the Carmack Amendment, legislation that addresses carrier liability for goods lost or damaged during an interstate

---

[1] Sompo, but not Nipponkoa, sued Norfolk Southern Corporation. For ease of reference, we will refer to the Norfolk entities that the plaintiffs have respectively sued simply as Norfolk Southern.

shipment. Following the Supreme Court's decision in <u>Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.</u>, 561 U.S. 89 (2010) ("<u>Regal-Beloit</u>"), which made clear that the Carmack Amendment does not apply to the shipments at issue, the ground shifted, and the cases were remanded to the United States District Court for the Southern District of New York (Denny Chin, *Judge*) for further proceedings on plaintiffs' state law claims. In these appeals, heard in tandem, plaintiffs ask us to decide the meaning and enforceability of provisions found in the bills that purport to designate the ocean carrier as the sole entity responsible to the cargo owners for damage to the cargo. In addition, the appeal in <u>Nipponkoa Insurance Co. v. Norfolk Southern Railway</u> challenges Nipponkoa's ability to maintain its claim for contractual indemnification – a claim assigned to it by the upstream ocean carrier – against Norfolk Southern and KCSR. For the reasons described below, we affirm the judgments of the district court in full.

## BACKGROUND

I.    <u>The Underlying Facts</u>

In March and April 2006, a number of manufacturers arranged to have their products shipped from places in Asia to locations in the southern United States. Two of the manufacturers sought to ship automotive parts from Japan to

5

Georgia, and hired Nippon Express U.S.A. ("Nippon Express"), a non-vessel owning common carrier ("NVOCC"),[2] to arrange for the transportation of the shipments.[3] Nippon Express issued a through bill of lading to the manufacturers ("Nippon Express bill of lading"). A through bill of lading is essentially a contract that describes the terms that will govern both the ocean and land portions of the shipments' transport.[4] Because Nippon Express does not itself provide transportation services, it hired Yang Ming – an ocean carrier – to provide the ocean transport and arrange the land leg of the shipments' journey. Accordingly, Yang Ming issued through bills of lading of its own to Nippon Express ("Yang Ming bill of lading"), detailing the terms under which the

---

[2] "An NVOCC will issue a bill of lading to the shipper but does not undertake the actual transportation of the cargo. Instead, the NVOCC delivers the shipment to an ocean carrier for transportation." Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 140 n.2 (2d Cir. 2010) (internal quotation marks omitted).

[3] The two shipments governed by the Nippon Express bill of lading that are relevant to these appeals are the Unisia Shipment and the Enplas Shipment. Sompo is pursuing a claim for damage to the Unisia Shipment, while Nipponkoa has secured a judgment for damage to the Enplas Shipment.

[4] "A through bill of lading covers both the ocean and inland portions of the transport in a single document." Regal-Beloit, 561 U.S at 94.

transportation would be undertaken.[5] A third manufacturer sought to ship tractors from Japan to Georgia, and contracted directly with Yang Ming to arrange for the entirety of the shipment's transportation.[6] Yang Ming again issued a through bill of lading.

With respect to each of the shipments, Yang Ming subcontracted responsibility for a portion of the inland transport to defendant Norfolk Southern and Norfolk Southern enlisted the assistance of defendant KCSR. Norfolk Southern undertook to transport the shipments pursuant to an Intermodal Transport Agreement ("ITA") that it had entered into with Yang Ming. The plaintiffs Sompo and Nipponkoa are the subrogees of the owners of the destroyed cargo.

The bills of lading contain a number of terms that, in the event of damage to or loss of the cargo, serve to limit the carriers' liability – for instance, provisions that cap the amount of damages to be paid per package of goods, and

---

[5] The parties have provided the court with a copy of the terms of the Yang Ming and Nippon Express bills of lading, as well as typed excerpts from those bills. Because the parties have not argued otherwise, we assume that the terms in each bill of lading issued by Yang Ming are identical in all material respects, and that the terms in each bill of lading issued by Nippon Express are similarly identical.

[6] This shipment is referred to as the Kubota Shipment; it is one of the two shipments that are the subject of Sompo's appeal.

that limit the time for filing suit.  The bills also contain Himalaya clauses[7] –

clauses that extend the benefit of the bills' liability-limiting provisions to

downstream carriers that are engaged by an upstream carrier to assist in the

carriage of goods.[8]  Most importantly, the Yang Ming bill of lading contains a

provision that Sompo and Nipponkoa refer to as an "Exoneration Clause."[9]  The

Exoneration Clause reads:

> It is understood and agreed that, other than the Carrier,
> no Person, firm or corporation or other legal entity
> whatsoever (Including the Master, officers and crew of

---

[7] "Clauses extending liability limitations take their name from an English case involving a steamship called *Himalaya*.  See Adler v. Dickson, [1955] 1 Q.B. 158 (C.A.)."  Norfolk S. Ry Co. v. Kirby, 543 U.S. 14, 20 n.2 (2004).

[8] The Himalaya Clause in the Nippon Express bill of lading reads: "If an action for loss or damage to the goods is brought against a person referred to in Clause 4.2, such person shall be entitled to avail himself of the defenses and the limits of liability which the Carrier is entitled to invoke under these conditions." Nipponkoa J.A. 73.  The Himalaya Clause in the Yang Ming bill of lading provides: "If, however, it shall be adjudged that any Person other than the Carrier is Carrier or bailee of the Goods, or under responsibility with respect thereto, then all exemptions and limitations of, and exonerations from, liability provided by law or by the terms in this Bill shall be available to such Person."  Id. at 76; 136.

[9] The Railroads refer to the provision as a "covenant not to sue."  Although the provision is not phrased or labeled as a covenant not to sue, because it purports to relieve the Railroads from liability to anyone other than Yang Ming, it renders suit against the Railroads by any such person futile.  We will refer to the clause as an Exoneration Clause, but the clause's appellation does not affect our analysis.

8

the vessel, agents, Underlying Carriers, Sub-Contractors and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise.

Sompo J.A. 241.

Consistent with the arrangements described above, the manufactured goods traveled from Asia to California by ocean vessel. In California, the shipments were loaded onto the trains of non-party Burlington Northern Santa Fe Railway Company, and transported to Texas, where they were transferred to the railcars of Norfolk Southern, which were operated by KCSR. The derailment took place just outside Dallas, Texas.

## II.    The Litigation: Round I

In the aftermath of the derailment, Sompo and Nipponkoa filed suit against the defendants. Both plaintiffs asserted claims under the Carmack Amendment, as well as claims for breach of contract, negligence, and bailment. In addition, in its amended complaint, Nipponkoa asserted a claim based on an assignment it received from Yang Ming of Yang Ming's rights against the defendants arising out of loss or damage to the Enplas Shipment. The defendants

answered without asserting that the Yang Ming bill of lading's Exoneration Clause prevented them from being liable to the plaintiffs.

Although the complaints asserted state law causes of action against the defendants, the litigation centered on plaintiffs' claims under the Carmack Amendment. The Carmack Amendment amended the Interstate Commerce Act ("ICA") in 1906. Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906) (current version at 49 U.S.C. § 11706). The ICA, itself enacted in 1887, created the Interstate Commerce Commission, which was responsible for regulating railroad rates.[10] The Carmack Amendment "addresses the subject of carrier liability for goods lost or damaged during shipment, and most importantly provides shippers with the statutory right to recover for the actual loss or injury to their property caused by any of the carriers involved in the shipment." Cleveland v. Beltman N. Am. Co., 30 F.3d 373, 377 (2d Cir. 1994) (emphasis omitted). It establishes "a single uniform regime for recovery by shippers" from any receiving or delivering carriers involved in the shipment of the goods, and preempts the "shipper's state and common law claims against a carrier for loss or damage to goods during

---

[10] In 1995, the Interstate Commerce Commission Termination Act replaced the Interstate Commerce Commission with the Surface Transportation Board. 49 U.S.C. § 702.

shipment." Project Hope v. M/V IBN SINA, 250 F.3d 67, 73-74 n.6 (2d Cir. 2001);

see also Adams Express Co. v. Croninger, 226 U.S. 491, 505-06 (1913). Prior to

the initiation of these actions, this Circuit had held that the Carmack Amendment

applied to the domestic rail leg of a continuous intermodal shipment originating

in a foreign country and traveling under a through bill of lading like the

shipments at issue here. See Sompo Japan Ins. Co. of Am. v. Union Pac. R. Co.,

456 F.3d 54, 59 (2d Cir. 2006) ("Sompo Japan"). That holding has since been

abrogated by the Supreme Court's decision in Regal-Beloit.

The Carmack Amendment is a favorite among shippers because it imposes

something close to strict liability on covered carriers, see Sompo Japan, 456 F.3d

at 59, abrogated on other grounds by Regal-Beloit, 561 U.S. at 100, and it

"imposes upon receiving rail carriers and delivering rail carriers liability for

damage caused during the rail route under the bill of lading, regardless of which

carrier caused the damage." Regal-Beloit, 561 U.S. at 98 (internal quotation

marks and alterations omitted). "Once the shipper establishes a prima facie case

of Carmack liability by showing delivery in good condition, arrival in damaged

condition, and the amount of damages, the carrier is liable for the actual loss or

injury to the property it transports," unless the carrier can establish that it was

11

free of negligence and that the loss or damage was caused by one of five excusable factors.[11] Sompo Japan, 456 F.3d at 59 & n.8 (internal quotation marks and citations omitted). The Amendment also "constrains carriers' ability to limit liability by contract." Regal-Beloit, 561 U.S. at 98 (citing 49 U.S.C. § 11706). Suffice it to say that, ordinarily, a carrier may not limit its liability to a shipper without first offering the shipper full Carmack liability. Sompo Japan, 456 F.3d at 59-60 (internal citations omitted).

Although the Carmack Amendment did not leave the defendants without defenses to the plaintiffs' suits, it circumscribed the field of litigable issues. Accordingly, only a few months after filing suit, Sompo moved for partial summary judgment, seeking to strike the defendants' defenses based on liability limitations in the pertinent through bills of lading and other contracts. Because our then-controlling decision in Sompo Japan made clear that the Carmack Amendment applied to the domestic rail leg of a continuous intermodal shipment originating in a foreign country, the litigation of this summary judgment motion focused on a slightly different issue – whether Norfolk

---

[11] Specifically, the defendant may avoid liability by proving that the loss or damage was caused by "(a) an act of God, (b) the public enemy, (c) an act of the shipper himself, (d) public authority, or (e) the inherent vice or nature of the goods." Sompo Japan, 456 F.3d at 59 n.8.

Southern, in its contract with Yang Ming, had entered into a type of private contract that might make the Carmack Amendment inapplicable. Cf. Regal-Beloit Corp., 561 U.S. at 98-99 ("The parties argue about whether they may contract out of Carmack's venue provisions and other requirements, see [49 U.S.C.] §§ 10502, 10709; but in light of the disposition and ruling to follow, those matters need not be discussed or further explored.").

The district court determined that Norfolk had not entered into such a contract,[12] that Carmack accordingly applied, and that because Norfolk had not offered the shippers the option of full Carmack liability, the defendants could not rely on any alternative terms limiting their liability for the damage to the cargo. Norfolk S. Ry., 540 F. Supp. 2d at 497-500. In a subsequent round of summary judgment practice, the plaintiffs' common law claims were dismissed as preempted by the Carmack Amendment. The parties disputed only whether the

---

[12] The district court also held that even if Norfolk Southern's contract with Yang Ming could be construed as such a private contract, it should not be so construed. Sompo Japan Ins. Co. v. Norfolk S. Ry. Co., 540 F. Supp. 2d 486, 498 (S.D.N.Y. 2008) ("Norfolk S. Ry.") ("I conclude that rail contracts for the movement of cargo traveling on the domestic rail leg of a continuous intermodal movement, such as the ITAs in this case, should be read as § 10502 and not § 10709 contracts."). For that conclusion, the court relied in part on Sompo Japan's holding that "Carmack applies to the domestic rail portion of an international shipment originating in a foreign country and traveling under a through bill of lading." Norfolk S. Ry., 540 F. Supp. 2d at 499 (internal quotation marks omitted).

13

plaintiffs had established all of the elements of a prima facie Carmack claim. Because the district court determined that they had, that no reasonable jury could conclude otherwise, and that no reasonable jury could find that the defendants had established a viable defense, the court granted summary judgment in the plaintiffs' favor.[13] Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 652 F. Supp. 2d 537, 542-45 (S.D.N.Y. 2009).

The defendants appealed. While the appeal was pending, however, the Supreme Court decided Regal-Beloit, 561 U.S. 89 (2010), holding that the Carmack Amendment "does not apply to a shipment originating overseas under a single through bill of lading," id. at 100, thereby abrogating our contrary holding in Sompo Japan. In light of this change in the governing law, we remanded these cases, explaining as follows:

> The district court granted summary judgment to the plaintiffs in these two related cases based on what was then binding Second Circuit precedent. The parties agree that the Supreme Court, in Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. —, 130 S.Ct. 2433 (2010), has abrogated the precedent upon which

---

[13] Initially, Sompo, but not Nipponkoa, moved for summary judgment on its Carmack Amendment claim. After the district court granted summary judgment in Sompo's favor on that claim, Nipponkoa moved for and was granted summary judgment on the same basis. Nipponkoa Ins. Co. Ltd. v. Norfolk S. Ry. Co., No. 07 Civ. 10498, 2009 WL 3734068 (S.D.N.Y. Nov. 9, 2009).

the district court relied. The plaintiffs-appellees have raised further grounds they claim would support the judgment regardless of <u>Regal-Beloit</u>, but concede that they did not present these grounds below because of the state of the law at the time. The parties therefore have agreed that we should decline to reach these issues so that the district court may have the first opportunity to address them on remand.

The judgment is VACATED and REMANDED for further proceedings.

<u>Nipponkoa Ins. Co. v. Norfolk S. Ry. Co.</u>, 394 F. App'x 751, 751-52 (2d Cir. 2010) (internal citations omitted).

III.     The Litigation: Round II

When the case returned to the district court, the plaintiffs' state law claims – no longer preempted by the Carmack Amendment – were reinstated. After an additional period of discovery, a third round of summary judgment practice ensued, now focused on the viability of the plaintiffs' state law claims. For the first time, the defendants argued that provisions in the Yang Ming and Nippon Express bills of lading – the Exoneration Clauses – prevented the defendants from being liable to the plaintiffs because those clauses designated the issuing carrier as the sole entity responsible to the cargo owners for damage to the cargo. Plaintiffs contested this argument on multiple fronts. In addition to arguing that

15

the defendants' assertion of the Exoneration Clauses was untimely, they contended that the clauses should not be interpreted to relieve the defendants of liability to the plaintiffs, and that if so interpreted the clauses would violate statutory law[14] and public policy.

The district court initially granted in part and denied in part the defendants' summary judgment motion. Because the court construed the Yang Ming bill of lading's Exoneration Clause as relieving the defendants of liability to the plaintiffs, and found that clause to be enforceable, the court granted summary judgment to the defendants with respect to the shipments covered by the Yang Ming bill of lading alone. With respect to the shipment that was covered by both the Yang Ming and Nippon Express bills of lading, however, the court ruled differently. Because the court determined that the putative Exoneration Clause in the Nippon Express bill of lading was ambiguous, it denied summary judgment, and instructed the parties to offer extrinsic evidence of the clause's intended meaning. See Sompo Japan Ins. Co. of Am., 891 F. Supp. 2d at 496-503.

---

[14] In the district court, plaintiffs argued that enforcement of the Exoneration Clauses would violate the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 note, and the Harter Act, 46 U.S.C. §§ 30702 et seq. Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 891 F.Supp. 2d 489, 499-500 (S.D.N.Y. 2012). The district court rejected those arguments, and plaintiffs have not contested that ruling on appeal.

16

Following the district court's decision, both sides moved for reconsideration. The defendants argued that it was unnecessary for the court to interpret the putative Exoneration Clause in the Nippon Express bill of lading because the shipment governed by that bill of lading was also governed by the Yang Ming bill of lading, which the court had already ruled contained an enforceable and unambiguous Exoneration Clause. In accordance with the Supreme Court's decision in Norfolk So. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14 (2004),[15] the defendants argued that they were entitled to invoke the Exoneration Clause in the Yang Ming bill of lading against the plaintiffs even though, with respect to the shipments at issue, the Yang Ming bill of lading was issued to Nippon Express, and not to the cargo owners in whose shoes the plaintiffs stood. For their part, plaintiffs argued that extrinsic evidence demonstrated that the terms of the Nippon Express bill of lading were not intended to bar the cargo owners from suing the defendants. In support of this

---

[15] In Kirby, the Supreme Court decided that the bills of lading at issue were maritime contracts governed by federal law, that Himalaya Clauses in bills of lading are subject to ordinary contract interpretation principles, and that the downstream rail carrier in that case was entitled to invoke the liability limitations contained in the bills of lading issued by upstream carriers to the cargo owner and to the cargo owner's intermediary. 543 U.S. at 24, 30-35.

17

argument, the plaintiffs submitted affidavits from a Nippon Express executive and an expert in the transportation industry.

Additionally, Nipponkoa argued that, irrespective of the meaning or enforceability of the Exoneration Clauses, it should prevail on its claim for damage to the Enplas Shipment, which it asserted as assignee of Yang Ming. In support of this claim, Nipponkoa relied on an indemnification provision in the ITA between Norfolk Southern and Yang Ming, which states that:

> [Norfolk Southern] will be liable for and will hold [Yang Ming] harmless against loss of or damage to freight in containers transported at the rates and charges provided in this Agreement and Exhibit 1 only to the extent that the sole proximate cause of said loss or damage is a railroad accident, derailment, or collision between railroad equipment negligently caused by [Norfolk Southern].

Nipponkoa J.A. 51. In opposing this claim, defendants argued that Nipponkoa was not entitled to summary judgment on its assigned claim for contractual indemnification because there was no evidence that Yang Ming had paid damages to anyone for damage to the Enplas Shipment.[16]

---

[16] The defendants also argued that the ITA required any suit pertaining to the agreement to be brought in specific venues that do not include New York City. The district court concluded that the defendants were estopped from pressing that argument by virtue of their prior admission that venue was proper in the Southern District of New York. The defendants do not renew their venue argument on appeal.

18

Upon reconsideration, the district court granted summary judgment in defendants' favor on all claims with the exception of Nipponkoa's claim for damage to the Enplas Shipment. On that claim, the district court granted summary judgment for Nipponkoa. See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 966 F. Supp. 2d 270, 279-82 (S.D.N.Y. 2013). Defendants again sought reconsideration of the district court's judgment. This time defendants argued that Nipponkoa's claim for contractual indemnification must fail because Yang Ming – the assignor of the claim – had no claim for contractual indemnification since, by the time Nipponkoa obtained the assignment, Yang Ming no longer had any potential liability for damage to the Enplas Shipment. The district court denied defendants' motion for reconsideration on the ground that it raised new arguments that could have been raised earlier.

IV.    The Appeals

Sompo appeals the grant of summary judgment in defendants' favor, and defendants appeal the grant of summary judgment in Nipponkoa's favor on its

19

claim for damage to the Enplas Shipment.[17]  For the reasons discussed below, we

affirm the judgments of the district court.

## DISCUSSION

"We review a district court's grant of summary judgment *de novo*."  Gould

v. Winstar Commc'ns, Inc., 692 F.3d 148, 157 (2d Cir. 2012).  Summary judgment

is appropriate only when, construing the evidence in the light most favorable to

the non-moving party, "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Where, as here, cross-motions for summary judgment are appealed, "each party's

motion must be examined on its own merits, and in each case all reasonable

inferences must be drawn against the party whose motion is under

consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

We consider each of the summary judgment decisions being appealed in

turn.  First, we consider whether the district court properly granted summary

judgment to the defendants on Sompo's claims.  Next, we consider whether the

---

[17]  Nipponkoa does not separately appeal the district court's grant of summary judgment to defendants on Nipponkoa's other claims.  It does, however, join in Sompo's arguments and presses those arguments as an alternative basis for affirming the district court's grant of summary judgment in Nipponkoa's favor on its claim pertaining to the Enplas Shipment.

district court properly granted summary judgment to Nipponkoa on Nipponkoa's claim for contractual indemnification arising out of damage to the Enplas Shipment.

I.      Sompo

The district court granted summary judgment in favor of defendants and against Sompo on the ground that the Exoneration Clause in the Yang Ming bill of lading unambiguously and validly relieved the Railroads of liability to the cargo owners in whose shoes Sompo stands. On appeal, Sompo presses roughly five objections to that ruling. Specifically, Sompo argues that (1) the district court exceeded the mandate issued by this Court in connection with the prior appeal when, on remand, the district court permitted the Railroads to raise defenses to Sompo's common law claims; (2) the Railroads waived their defense based on the Exoneration Clauses by failing to plead it in their answer to Sompo's complaint and by failing to raise it at any point in the litigation prior to the summary judgment practice that ensued upon remand; (3) the Exoneration Clause in the Yang Ming bill of lading is ambiguous and should be construed against the Railroads; (4) insofar as the Exoneration Clause is construed as relieving the Railroads from liability to the cargo owners, that construction is contrary to the

21

intent of the parties that executed the bill of lading, industry practice, and public policy; and (5) Nippon Express did not have authority to bind a cargo owner – and thus Sompo – to the Exoneration Clause in the Yang Ming bill of lading.[18] We consider each of these arguments in turn.

A. Mandate Rule

"Under the law-of-the-case doctrine, where a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004) (internal quotation marks and brackets omitted). The "mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Brown v. City of Syracuse, 673 F.3d 141, 147 (2d Cir. 2012) (internal quotation marks omitted). Furthermore, where the mandate

---

[18] In a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Sompo and Nipponkoa point the Court to the Sixth Circuit's decision in CNA Insurance Co. v. Hyundai Merchant Marine Co., 747 F.3d 339 (6th Cir. 2014), and claim that it supports their point that "when the intermodal bill of lading incorporates the Carmack Amendment by reference, then the through bill of lading must offer a full Carmack option or a carrier cannot limit its liability." Dkt No. 13-3416, ECF No. 69. That argument is made nowhere in the plaintiffs' briefs and is therefore waived.

limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand.  See Riley v. MEBA Pension Trust, 586 F.2d 968, 970-71 (2d Cir. 1978).

We conclude that the district court did not violate the mandate rule when it considered the Railroads' defenses based on the Exoneration Clauses in the pertinent bills of lading.  To begin, Sompo does not, and cannot, contend that this Court addressed the merits of those defenses.  The Railroads' original appeal challenged the district court's determination that the Carmack Amendment applied to the shipments it carried.  The Supreme Court's decision in Regal-Beloit revealed that determination to be erroneous.  The Railroads' appeal did not raise, and we did not address, whether certain defenses that might be viable against Sompo's state law claims were they not preempted, but that would not have been available if the Carmack Amendment applied, would succeed.  Thus the district court did not violate the mandate rule by addressing on remand an issue that was not decided by this Court in the original appeal.  See New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 606 (2d Cir. 2003) ("[A] mandate is controlling only as to matters within its compass . . . . Put simply, the

23

law of the case does not extend to issues an appellate court did not address." (internal quotation marks and citations omitted)).

Nor are we persuaded that our remand order instructed the district court not to consider the Railroads' defenses. Sompo insists that the remand order required the district court to consider only plaintiffs' "further grounds" for relief, and not any defenses the Railroads might have to those grounds. Sompo's Br. at 21. Sompo's interpretation of our remand order is utterly implausible. While the order acknowledged that "[t]he parties . . . have agreed that we should decline to reach these issues so that the district court may have the first opportunity to address them on remand," it did not instruct the district court to limit its consideration to the prima facie elements of additional claims the plaintiffs might seek to pursue on remand. Nipponkoa Ins. Co., 394 F. App'x at 751-52. Instead, we simply vacated the judgment and remanded "for further proceedings," leaving it to the district court to determine how the case ought to proceed. See United States v. Salameh, 84 F.3d 47, 49 (2d Cir. 1996) (remand order that "specified only that the case was remanded 'for further proceedings' . . . permitted the District Court itself to determine the appropriate course of 'further proceedings.'"). Furthermore, the remand order itself acknowledged that the

24

plaintiffs "did not present [their further] grounds [for relief] below because of the state of the law at the time." 394 F. App'x at 752. It is illogical to suppose that we instructed the district court to consider claims that were not previously pursued by the plaintiff, but prohibited the district court from considering defenses to those claims.

B. Waiver

As a separate matter, a party may waive an argument by failing to raise it in a timely manner, making consideration of that argument by the district court inappropriate in certain circumstances even if consideration is not barred by the appellate court's mandate. No such waiver prevents consideration of the Railroads' defenses.

The district court did not exceed its discretion by considering the defenses despite the defendants' failure to plead them in their answers. It is true that a party responding to a pleading "must affirmatively state any avoidance or affirmative defense," Fed. R. Civ. P. 8(c)(1), and that generally, "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir. 1984) (internal quotation marks omitted). Nonetheless, "a district court may entertain

25

unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." Rose v. AmSouth Bank of Fla., 391 F.3d 63, 65 (2d Cir. 2004) (internal quotation marks, ellipsis, and alteration omitted). Those are precisely the circumstances here.

We reject Sompo's contention that the Railroads waived the Exoneration Clause defense by failing to raise it in the initial rounds of summary judgment practice that preceded the Railroads' prior appeal, or on appeal to this Court. The Exoneration Clause defense would have been irrelevant in those contexts. It is undisputed that if the Carmack Amendment applied to the shipments carried by the Railroads, and if the Railroads had not entered into the type of private contract that might make Carmack inapplicable, the Exoneration Clauses would be unenforceable against the plaintiffs because the cargo owners were not offered the option of full Carmack liability. The initial rounds of summary judgment, and the Railroads' first appeal, focused on questions about the applicability of Carmack to the shipments at issue and on plaintiffs' ability to establish a prima facie case under the Amendment. Neither of those questions could be answered, or in any way influenced, by reference to the existence of putative Exoneration

26

Clauses in the Yang Ming and Nippon Express bills of lading. It is thus entirely appropriate, and unremarkable, that the Railroads did not seek to press that defense at those stages of the litigation. But the Supreme Court's decision in Regal-Beloit marked a sea change in the case. The Carmack Amendment – formerly the focus of the litigation – was rendered inapplicable to the shipments at issue. The parties took stock of their changed circumstances, and plaintiffs elected to continue the litigation on claims previously believed to be preempted. The summary judgment practice that ensued upon remand was, for all practical purposes, the Railroads' first opportunity to litigate the viability of their Exoneration Clause defense.

For the same reason, we are unpersuaded that Sompo has suffered any prejudice as a result of the Railroads' failure to raise the Exoneration Clauses prior to summary judgment practice on remand. Although Sompo deplores the time and money wasted on the initial phase of litigation in the trial court and on the first appeal to this Court, none of that waste was attributable to the Railroads' failure to assert the Exoneration Clauses at an earlier stage. Rather, Sompo's misfortunes are the result of its own, entirely reasonable, decision to pursue this litigation under the framework of the Carmack Amendment, and of a change in

27

the law that rendered plaintiffs' efforts on that front for naught. In short, we are not convinced that the district court's consideration of the Railroads' defense was in any way improper.

This Court's decision in <u>Parmalat Capital Financial Ltd. v. Bank of America Corp.</u>, 671 F.3d 261 (2d Cir. 2012) is not to the contrary. In a prior appeal of the consolidated cases involved in <u>Parmalat</u>, the plaintiffs there had challenged the district court's decision not to abstain from deciding the cases pursuant to the mandatory abstention provision in 28 U.S.C. § 1334(c)(2) that applies to bankruptcy-related proceedings.[19] We vacated those decisions in part and remanded for a determination of whether the cases could be "timely adjudicated" in Illinois state court in accordance with factors set out in our opinion. <u>Id</u>. at 264. On remand, the district court ruled that even if the cases could be "'timely adjudicated' in the Illinois state courts, mandatory abstention did not apply because these cases 'could have been commenced' in federal court." <u>Id</u>. at 270 (ellipsis omitted). We concluded that "[i]t was error [for the district court] to consider this argument, because it had been waived, and because it was outside

---

[19] "Section 1334(c)(2) provides that, in certain circumstances, a district court must abstain from hearing state law claims that are related to a bankruptcy case when those proceedings can be 'timely adjudicated' in state court." <u>Parmalat</u>, 671 F.3d at 266.

the scope of the mandate set forth in our previous Opinion." Id. In so ruling, the court explained that "this argument was waived in the initial appeal, because it had not been raised with the District Court as a basis to avoid mandatory abstention," and consideration of the argument exceeded the court's mandate, which "focused specifically and exclusively on the question of 'timely adjudication.'" Id.

Parmalat is far removed from the circumstances of this case. Unlike in Parmalat, where the new argument considered on remand would have been determinative of the issue decided by the district court in the initial phase of litigation, in this case the Railroads' Exoneration Clause defense would have been irrelevant to the issues litigated before the district court and the court of appeals during the initial phase of litigation. Furthermore, while the opinion remanding the cases to the district court in Parmalat focused specifically and exclusively on the question of timely adjudication, our order was not so focused, instead recognizing that whatever further grounds for relief the plaintiff might have, those grounds had not previously been presented to the district court. Under the circumstances, the district court properly considered the Railroads' defenses to the plaintiffs' common law claims. Because the district court's consideration of

29

the Exoneration Clause defense was proper, we proceed to consider the merits of that defense.

    C.  <u>Interpretation of the Yang Ming Bill of Lading's Exoneration Clause</u>

Sompo next argues that the Exoneration Clause in the Yang Ming bill of lading – which the Railroads argue prevents them from being held liable to Sompo – is ambiguous and should be construed against the Railroads.[20] The alleged ambiguity in the putative Exoneration Clause is created by the interaction of the Exoneration Clause itself and the Yang Ming bill of lading's definitions of the terms "Carrier" and "Underlying Carrier."

As described above, the Exoneration Clause provides:

> It is understood and agreed that, other than *the Carrier*,
> no Person, firm or corporation or other legal entity
> whatsoever (Including the Master, officers and crew of
> the vessel, agents, *Underlying Carriers*, Sub-Contractors
> and/or any other independent contractors whatsoever

---

[20] In the district court, the parties agreed that the bills of lading of two other ocean carriers responsible for some of the shipments "contain[ed] covenants not to sue any party other than the carrier that issued the bill." <u>Sompo Japan Ins. Co. of Am.</u>, 891 F. Supp. 2d at 496. The parties only disputed whether the Yang Ming and Nippon Express bills of lading contained such provisions. The district court ruled that the Yang Ming bill of lading, but not the Nippon Express bill of lading, unambiguously prevented the Railroads from being held liable to the plaintiffs. Because of our disposition of the issues pertaining to the Yang Ming bill of lading, we need not address the putative Exoneration Clause in the Nippon Express bill of lading.

utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise.

Sompo J.A. 241 (emphasis added).  Meanwhile, however, the bill defines the term "Carrier" as "the party on whose behalf this Bill is issued, as well as the Vessel and/or her Owner, demise charterer (if bound hereby), the time charterer and an[y] substituted or *Underlying Carrier* whether any of them is acting as a Carrier or bailee."  Id. (emphasis supplied).  The bill further defines the term "Underlying Carrier" to "include[] any water, rail, motor, air or other carrier utilized by the Carrier for any parts of the transportation [of] the shipment covered by this Bill."  Id.  The parties agree that the Railroads are "Underlying Carriers" within the meaning of the Yang Ming bill of lading.

Because "Underlying Carriers" are included within the bill's definition of "Carrier," the Railroads are also "Carriers" per the definition of that term.  As a result, although the Exoneration Clause purports to state that *only* "the Carrier" shall be liable, and that no one else – including any Underlying Carrier – shall be, because of the inclusive definition of the term "Carrier," the Exoneration Clause simultaneously states that the Railroads *can* be held liable and that they *cannot* be. Relying on this odd result, Sompo argues that the clause is ambiguous and must

be construed against the parties seeking its benefit, here the Railroads. We cannot agree.

To be sure, "[t]he traditional rule of construction, applied in admiralty cases, is to construe contract language most strongly against its drafter." Navieros Oceanikos, S.A. v. S.T. Mobil Trader, 554 F.2d 43, 47 (2d Cir. 1977) (internal quotation marks and ellipsis omitted).[21] "That maxim only applies, however, where the contract language is ambiguous – where it is *susceptible of two reasonable and practical interpretations*." Id. (internal quotation marks omitted) (emphasis supplied). Here, the only reasonable interpretation of the clause is that the carrier that issued the bill of lading – Yang Ming – and no one else, shall be liable to the cargo owners and those subrogated to the cargo owners' interests. Sompo's proposed interpretation, which is to read the clause as inherently contradictory, is not reasonable because it renders the clause nonsensical. In contrast, the interpretation that we adopt, although requiring us to the read the term "Carrier" more restrictively for purposes of the Exoneration Clause than the

---

[21] "[S]o long as a bill requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce – and thus it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage." Kirby, 543 U.S. at 27. The parties do not dispute that the Yang Ming bill of lading is a maritime contract.

bill's definition would seemingly require for the contract generally, gives the Exoneration Clause a comprehensible meaning and does not render any other clause meaningless. The bill's expansive definition of "Carrier" is not rendered meaningless by our interpretation because that broader definition may govern application of other sections of the bill.[22] See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK), Ltd., 230 F.3d 549, 558 (2d Cir. 2000) ("In a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

Our interpretation is also supported by the rule of construction that a specific contract provision should prevail over a general one. See J. Aron & Co. v. The Askvin, 267 F.2d 276, 277 (2d Cir. 1959) ("Effect should be given to all the contract terms and the specific controls the general."). While the Yang Ming bill of lading's definition section provides definitions of terms that are generally

---

[22] The broader definition of Carrier may be applicable, for example, in Section 2 of the Yang Ming bill of lading, which incorporates the terms and conditions of the "Carrier's" tariffs as part of the bill of lading, and Section 25, which provides that the Carrier "shall have a lien on the Goods" being shipped under the bill of lading. Sompo J.A. 244. As the Railroads point out, unlike the Exoneration Clause, Sections 2 and 25 function normally with the broader definition of "Carrier" applied.

applicable throughout the bill, the Exoneration Clause specifically withdraws "Underlying Carriers" from the group of entities considered to be the "Carrier" in the context of that clause. The Exoneration Clause thus expressly contrasts "Underlying Carriers," who are *not* to be deemed liable "as Carrier[s]," with "the Carrier," which bears exclusive liability. Sompo J.A. 244. Accordingly, we conclude that the Exoneration Clause in the Yang Ming bill of lading unambiguously prevents the Railroads from being held liable to Sompo.

Sompo next argues that our interpretation contravenes the intent of the parties to the bill of lading and industry practice. In support of its argument, Sompo points to the affidavits of Atsushi Maeda, an executive of Nippon Express, and Peter J. Zambito, an expert on transportation industry custom and practice. In his affidavit, Maeda explains that the Nippon Express bill of lading was "intended to ensure that any carrier in the chain could be claimed against or litigated against, should they be the carrier who caused the loss or damage." Sompo J.A. 510. For his part, Zambito avers that "it . . . has always been routine and common for the offending party [in a case like this] to settle directly with cargo interests, regardless of whether there is a direct contract between the two and whether or not the bill of lading contains a so-called covenant not to sue a

34

subcontractor, such as are at issue in this case." Id. at 514. He further opines that "it has been the understanding in the industry for decades that an exoneration of liability or covenant not to sue in a bill of lading would not be enforced in favor of a subcontractor." Id. at 516. Sompo's evidence of contractual intent and industry practice is unpersuasive.

To begin, Sompo's reliance on the Maeda affidavit is flawed in at least two respects. First, because the Exoneration Clause unambiguously relieves the Railroads of liability to Sompo, we may not consider extrinsic evidence of the contracting parties' intent to vary the meaning of that clause. See Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26-27 (2d Cir. 1988) ("In the absence of ambiguity, the effect of admitting extrinsic evidence would be to allow one party to substitute his view of his obligations for those clearly stated." (internal quotation marks omitted)). Second, even if extrinsic evidence of the contracting parties' intent were admissible, extrinsic evidence of intent would only be relevant insofar as it clarified what the contracting parties intended the Exoneration Clause in the Yang Ming bill of lading to mean. But, Maeda – an executive of Nippon Express – testified only to his understanding of the meaning of the terms in the Nippon Express bill of lading. He did not express any view on

35

the meaning of the putative Exoneration Clause in the Yang Ming bill of lading. Furthermore, even if we assumed that Maeda understood the Exoneration Clause in the Yang Ming bill of lading to permit the cargo owners to hold underlying carriers liable for damage to their cargo, that hardly suggests that Yang Ming, the contractual counterparty, held such a view of the clause's effect.

Sompo's evidence of industry practice (essentially, the Zambito affidavit) is also unavailing. Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance. See Kerin v. U.S. Postal Serv., 116 F.3d 988, 992 & n.2 (2d Cir. 1997) (considering evidence of trade usage to determine that contract's reference to "sewerage service" was ambiguous). Terms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry. But Sompo does not contend that terms in the Exoneration Clause have a specialized meaning in the transportation industry distinct from the ordinary or common meaning that would otherwise be ascribed to them. Instead, the industry practice evidence that Sompo offers is expert testimony that, regardless of what the exoneration clauses mean, they simply are not enforced. In other words, Sompo is asking us to consider evidence of industry practice and custom

36

in order to persuade us to ignore the Exoneration Clause, not to help us interpret

it. As one of our sister circuits has explained,

> Consideration of trade practice may be a useful interpretation aid where there is a term in the contract that has an accepted industry meaning different from its ordinary meaning or where there is a term with an accepted industry meaning that was omitted from the contract. But [appellant] does not claim that there is such a term of art included or omitted here. Trade practice is therefore irrelevant in this case, and the contract's unambiguous terms govern.

Hunt Constr. Grp, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002)

(internal quotation marks and first alteration omitted).

In sum, Sompo has presented no evidence to suggest that the Exoneration

Clause in the Yang Ming bill of lading was intended to have a meaning different

from the one we have given it.

D. Enforceability of the Exoneration Clause

Because we have determined that the Exoneration Clause in the Yang Ming

bill of lading unambiguously relieves the Railroads of liability to Sompo, we

must next consider Sompo's arguments that the clause is unenforceable.

Sompo first argues that the Exoneration Clause is unenforceable because it

violates the public policy against permitting a common carrier to stipulate to

37

immunity for the negligence of itself or its agents.  Sompo contends that the

principle has been established for over a century by Supreme Court precedent,

and lower federal court cases.  See, e.g., United States v. Atl. Mut. Ins. Co., 343

U.S. 236, 239 (1952); Adams Express Co., 226 U.S. at 509-12; Hart v. Pa. R. Co., 112

U.S. 331, 338, 340-41 (1884); Bank of Ky. v. Adams Express Co., 93 U.S. 174, 181,

183 (1876); N.Y Cent. R.R. Co. v. Lockwood, 84 U.S. (17 Wall) 357, 374-81, 384

(1873); York Co. v. Cent. R.R., 70 U.S. (3 Wall.) 107, 111 (1865); Klicker v. Nw.

Airlines, Inc., 563 F.2d 1310, 1312-13 (9th Cir. 1977); Demel v. Am. Airlines, Inc.,

No. 09 Civ. 5524(PKC), 2011 WL 497930, at *4, *6 (S.D.N.Y. Feb. 10, 2011);

Associated Metals and Minerals Corp. v. M/V Kilmelford, No. B-81-3085, 1983

WL 595, at *4 (D. Md. Sept. 23, 1983).  While that principle is as well-established

as Sompo claims, its application to a clause like the instant one is not.  Indeed,

with the exception of a single district court case,[23] none of the cases cited by

---

[23]  That case is Associated Metals and Minerals Corp. v. M/V Kilmelford, No. B-81-3085, 1983 WL 595, at *4 (D. Md. Sept. 23, 1983).  In Associated Metals, the shipper and subrogated insurer sought to recover against a stevedore for damage to a shipment of steel.  The stevedore argued that it was not liable to the plaintiffs, relying on a provision of the governing bill of lading that stated: "It is hereby expressly agreed that no servant or agent of the Carrier (including every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Shipper, Consignee, Receiver or Owner of the goods or to any holder of this Bill of Lading for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course or

Sompo involve provisions even remotely similar to the Exoneration Clause in the

Yang Ming bill of lading.

---

in connection with his employment." Id. at *1.  The district court rejected the stevedore's argument, concluding that the provision was "null and void, both under COGSA and common law."  Id. at *2.  The district court relied on the Fifth Circuit's decision in Brown & Root, Inc v. M/V Peisander, 648 F.2d 415, 419 (5th Cir. 1981), which stated that "at most, all the Himalaya clause does is extend to Stevedore whatever and only such 'defenses' as Carrier has.  This leads to the natural conclusion . . . that whatever rights Stevedore has to limit liability are necessarily limited to those which Carrier had, [and] . . . if [the defense would be] unavailable to the Carrier [against the Shipper] it is automatically unavailable to the Stevedore."  Brown & Root, 648 F.2d at 419.  The district court extended the Fifth Circuit's reasoning to hold that "[b]ecause COGSA does not permit a carrier to enforce a provision for total exoneration," the stevedore could not enforce a provision for total exoneration through the carrier's contract with the shipper. Associated Metals, 1983 WL 595, at *4.

Associated Metals, which is not binding on us in any event, is unpersuasive.  First, the case does not address the fact that the exoneration clause, as applied to the stevedore, would not in fact result in complete exoneration since the stevedore remained liable to the common carrier that issued the bill of lading.  Furthermore, the court's decision is premised on the principle that a Himalaya Clause cannot extend to subcontractors defenses that would not be available to the issuing carrier itself.  Although the language of a particular Himalaya Clause might limit the types of defenses that are extended to subcontractors, we see no reason why a Himalaya Clause could not extend to subcontractors defenses that are not available to the issuing carrier itself.  The operation of a Himalaya Clause is after all, as the Supreme Court has instructed, simply a matter of contract.  Kirby, 543 U.S. at 31-32.  Here, the Himalaya Clause in the Yang Ming bill of lading broadly provides that "[i]f . . . it shall be adjudged that any Person other than the Carrier is Carrier or bailee of the Goods, or under responsibility with respect thereto, then *all exemptions and limitations of, and exonerations from, liability* provided by law *or by the terms in this Bill* shall be available to such Person." Sompo J.A. 241 (emphasis supplied).

39

Furthermore, we are not convinced – despite the clause's appellation – that it in fact exonerates a common carrier or its agent from liability for damages caused by their negligence. Considered carefully, the Exoneration Clause does no such thing. Instead, the clause designates Yang Ming, and only Yang Ming, as the entity responsible for loss of or damage to a shipment caused by itself or any entity involved in the transportation of the cargo. It thereby concentrates all liability to the cargo owner in the issuing carrier, essentially requiring the cargo owner to sue the issuing carrier, and no one else, for damage to or loss of the cargo. The clause correspondingly prevents underlying carriers, like the Railroads, from being held liable for the damage they cause by their negligence *to any entity other than Yang Ming*. The Railroads are not, however, relieved of liability for their negligence. They remain liable, as Sompo concedes, to Yang Ming.[24]

Understood in context, the clause is simply an ordering mechanism. Cf. Fed. Ins. Co. v. Union Pac. R.R. Co., 651 F.3d 1175, 1180 (9th Cir. 2011) ("The

---

[24] The Yang Ming bill of lading provides that "[i]t is also agreed that each of the aforementioned Persons referred to in the [Exoneration Clause] are intended beneficiaries, but nothing herein contained shall be construed to limit or relieve them from liability to the Carrier for acts arising or resulting from their fault or negligent [sic]." Sompo J.A. 241.

requirement that all suits be brought against [the ocean carrier] is an enforcement mechanism rather than a reduction of the carrier's obligations to the cargo owner below what COGSA guarantees." (internal quotation marks omitted)).  It serves to regulate who will be responsible to whom.  Thus, Sompo concedes that it could sue Yang Ming for the damage to the cargo, and Yang Ming could then sue the Railroads.[25]  It can fairly be assumed, as Sompo argues, that by requiring the cargo owner, or its subrogee, to sue the issuing carrier even when an underlying carrier is the party at fault for the damage to the cargo, the Exoneration Clause makes litigation of the claim for damage more challenging in some respects.  We see no reason, however, why parties to a shipping contract should be prohibited, as a matter of public policy, from channeling claims for damage to cargo through the carrier that issues the through bill of lading.

---

[25]  We do not mean to suggest that it is currently possible for Sompo to sue Yang Ming, merely that the Exoneration Clause does not preclude such a suit.  We need not decide whether a suit by Sompo against Yang Ming would be time-barred, or frustrated by other circumstances.  Furthermore, we acknowledge that, if the Railroads were correct that the Nippon Express bill of lading contains an Exoneration Clause, that clause would prohibit Sompo from suing Yang Ming for damage to the particular shipment governed by the Nippon Express bill of lading.  But in that case, Sompo's remedy would be to sue Nippon Express for the damage to the cargo.

For similar reasons, we do not believe that the Exoneration Clause violates the letter or the spirit of the Supreme Court precedent on which Sompo relies. As Sompo points out, at common law, it is the general rule that "a common carrier may, by special contract, limit his common-law liability; but . . . he cannot stipulate for exemption from the consequences of his own negligence or that of his servants." Hart, 112 U.S. at 338. Examination of the precedent enforcing this principle, particularly in the context of cargo damaged by a common carrier, reveals that the general rule is animated principally by two concerns: (1) a desire to ensure that the cargo owner obtains full compensation for damage to its cargo, see Atl. Mut. Ins. Co., 343 U.S. at 241-42 ("[I]t would be 'anomalous' to hold that a cargo owner, who has an unquestioned right under the law to recover full damages from a noncarrying vessel, can be compelled to give up a portion of that recovery to his carrier because of a stipulation exacted in a bill of lading."); and (2) concern that a contrary rule would induce the carrier to exercise less care, see Hart, 112 U.S. at 340 (upholding provision limiting amount of loss recoverable because it "does not induce want of care" but rather "exacts from the carrier the measure of care due to the value agreed on").

Enforcement of the Exoneration Clause does not conflict with either of these concerns. As explained, the cargo owner, or its subrogee, can still sue the issuing carrier for damage caused by underlying carriers and thereby obtain the recovery to which it is entitled. Furthermore, the clause should not induce want of care on the part of the underlying carrier because that carrier remains liable for the consequences of its negligence to the issuing carrier. Accordingly, we conclude that the Exoneration Clause is not void as against public policy, and may therefore be enforced by the Railroads against Sompo.

E. Authority of Intermediary to Bind Cargo Owner

With respect to the Unisia shipment, which is governed by both the Nippon Express bill of lading and the Yang Ming bill of lading,[26] Sompo argues that because the Nippon Express bill of lading does not unambiguously contain an Exoneration Clause, and because Nippon Express was not authorized by the cargo owner to agree to the Exoneration Clause in the Yang Ming bill of lading, it is entitled to sue the Railroads for damage to that shipment.

As explained above, the cargo owner of the Unisia Shipment contracted with Nippon Express to arrange the transportation of the cargo. We assume

---

[26] The Enplas Shipment, which is the subject of Nipponkoa's judgment, is also governed by both the Yang Ming and Nippon Express bills of lading.

arguendo that the bill of lading issued by Nippon Express to the owner does not contain an Exoneration Clause. Nippon Express, a NVOCC, does not itself transport goods. It therefore contracted with Yang Ming to perform part, and arrange the remainder, of the transportation of the Unisia Shipment. The Yang Ming bill of lading issued to Nippon Express contains the Exoneration Clause at issue. Sompo, standing in the shoes of the cargo owner, argues that Nippon Express had no authority to agree to the Exoneration Clause in the Yang Ming bill of lading, and that the clause is therefore not enforceable with respect to Sompo's claim for damage to the Unisia Shipment. Guided by the Supreme Court's decision in Kirby, we are compelled to disagree.

While it is certainly true that an intermediary like Nippon Express "is . . . not automatically empowered to be the cargo owner's agent in every sense . . . when it comes to liability limitations for negligence resulting in damage, an intermediary can negotiate reliable and enforceable agreements with the carriers it engages." Kirby, 543 U.S. at 33. The facts of Kirby were strikingly similar to those here. In Kirby, the cargo owner hired a freight forwarding company, International Cargo Control ("ICC"), to arrange for the transportation of goods from Australia to Alabama. ICC issued a bill of lading to the cargo owner that

44

limited the carrier's liability for any loss or damage to the goods occurring during the land leg of the journey to a specified amount that was higher than $500 per package. Subsequently, ICC hired Hamburg Süd, an ocean shipping company, to transport the goods. Hamburg Süd issued a bill of lading to ICC that limited recovery for any loss or damage to the cargo to $500 per package. When the train carrying the cargo derailed, the cargo interest and its insurer sued the railroad (coincidentally, Norfolk Southern) for $1.5 million in damages.

Norfolk argued that it was entitled to invoke the less generous $500 per package damages limitation in the Hamburg Süd bill of lading to limit its liability.[27] The plaintiffs argued that they could not be bound by a liability limitation contained in a bill of lading to which they were not parties. The Supreme Court disagreed, ruling that "[w]hen an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." Kirby, 543 U.S. at 33. The Court explained that while a shipper hired by a cargo

---

[27] Norfolk also argued, and the Supreme Court held, that it was entitled to invoke the liability limitations contained in the ICC bill of lading by virtue of that bill's Himalaya Clause. Because the Hamburg Süd bill of lading included a less generous package limitation that Norfolk was keen to invoke, the Court also had to decide whether Norfolk was entitled to invoke that bill's liability limitations against the cargo interests. Id. at 30-32.

owner to arrange transportation of cargo is not the cargo owner's agent in "the classic sense," it is nonetheless the cargo owner's agent for the "single, limited purpose"of contracting with "subsequent carriers for limitation on liability." Id. at 34 (emphasis omitted).

The Court offered three reasons in support of the rule it adopted. First, a contrary rule would be unworkable because carriers, who may not know whether they are dealing with an intermediary or a cargo owner, would be required to track down that information – a nearly impossible task in international shipping – in order to assure themselves that their contractual liability limitations would be enforceable. Second, a contrary rule would induce discrimination in common carriage, contrary to the goals of statutory and decisional law, because "if liability limitations negotiated with cargo owners were reliable while limitations negotiated with intermediaries were not, carriers would likely want to charge the latter higher rates." Id. at 35. And finally, holding a cargo owner to the terms agreed upon by its intermediary is equitable because the cargo owner retains the option to sue the intermediary carrier that is responsible "for any gap between the liability limitations" in the bill issued by the intermediary and the bill issued by the subsequent carrier. Id.

Kirby controls this case. Nippon Express was the agent of the cargo owner, in the limited sense articulated in Kirby, when it contracted with Yang Ming for the liability limitations, including the Exoneration Clause, contained in the Yang Ming bill of lading. Accordingly, Sompo is bound by the Exoneration Clause, which the Railroads are entitled to invoke by virtue of the bill's Himalaya Clause. Sompo protests that Kirby is limited to provisions that limit a carrier's liability to a specified dollar amount, and does not apply to provisions that exonerate a remote carrier from any liability.[28] We see nothing in the reasoning of the Supreme Court's decision that would support that distinction. The Exoneration Clause is simply another form of liability limitation. While the package limits at issue in Kirby limited the amount per package that the plaintiff could recover, the Exoneration Clause limits the entities against which the plaintiff may recover. Moreover, the reasons supporting the Supreme Court's rule in Kirby apply with equal force to a clause that exonerates a remote carrier from liability to the cargo interests. The downstream carrier that contracts with an intermediary to

_____

[28] Sompo urges us to adopt the reasoning of Royal & Sun Alliance Ins. PLC v. Ocean World Lines, Inc., 572 F. Supp. 2d 379 (S.D.N.Y. 2008), affirmed on other grounds 612 F.3d 138 (2d Cir. 2010), which interpreted Kirby as "ruling that the agent's authority extended only to accepted package limitations." Id. at 398. For the reasons described in the text, we decline to do so.

exonerate a remote carrier from liability is just as unlikely to know whether it is

dealing with an intermediary or cargo owner as the downstream carrier that

contracts with an intermediary for a package limitation. Thus, the information-

gathering costs are just as onerous. Furthermore, it is fairer to place

responsibility "for any gap between the liability limitations" in the Nippon

Express and Yang Ming bills of lading on Nippon Express, the only entity in a

position to know that such a gap exists.

F. Conclusion

Having carefully considered all of Sompo's objections to the district court's

decision, we conclude that summary judgment for defendants was properly

entered. Accordingly, we reject Sompo's appeal and affirm the judgment in

Docket No. 13-3416.

II.    Nipponkoa

The district court granted summary judgment in Nipponkoa's favor on its

claim for contractual indemnification arising out of the destruction of a shipment

of automotive parts manufactured by a company called Enplas Corporation.

Unlike Nipponkoa's other claims, which it asserted in its role as the subrogee of

the cargo interests, and which fail for the same reasons discussed above in

48

connection with Sompo's appeal, Nipponkoa asserted this claim as the assignee of Yang Ming.

In order to explain the nature of Nipponkoa's claim and how Nipponkoa obtained the assignment of the claim, some background is necessary. As described above, Yang Ming engaged Norfolk Southern to carry the various shipments of manufactured goods by train to locations in the southern United States. Norfolk Southern undertook the carriage of the goods pursuant to a pre-existing contract between itself and Yang Ming, known as the Intermodal Transportation Agreement ("ITA"). The ITA lays out the rates and terms that govern transportation services Norfolk Southern has agreed to provide Yang Ming. The ITA contains a number of indemnification provisions under which either Norfolk Southern or Yang Ming agreed to indemnify the other for certain losses or damage that might be sustained by one party during the course of transporting shipments. As relevant here, Norfolk Southern agreed to indemnify Yang Ming for loss of or damage to freight under certain circumstances:

> [Norfolk Southern] will be liable for and will hold [Yang Ming] harmless against loss of or damage to freight in containers . . . only to the extent that the sole proximate cause of said loss or damage is a railroad accident,

derailment, or collision between railroad equipment
negligently caused by [Norfolk Southern].

Nipponkoa J.A. 51.

Under the terms of the ITA, Yang Ming is permitted "[u]pon written notice to [Norfolk Southern], [to] assign to third parties its right to make claims against [Norfolk Southern] for freight loss and damage." Nipponkoa J.A. 52. In February 2007, Yang Ming wrote to Norfolk informing it that a claim had been filed relating to the Enplas Shipment, and that Yang Ming intended to assign the claim to either TM Claims Services (Enplas Corporation's underwriter) or WK Webster (Nipponkoa's claims agent) to deal with Norfolk directly. Norfolk Southern does not allege that it made any objection at that time. Moreover, shortly before the assignment was executed in October 2007, Nipponkoa, through its claims agent, corresponded with Norfolk Southern about the assignment. During their correspondence, Norfolk Southern confirmed that the contractual limitations period for claims by Yang Ming had not yet run, and provided Nipponkoa with an assignment form to be executed by Yang Ming.[29] Against

---

[29] Nipponkoa's claims agent asked Norfolk Southern to "confirm by return e-mail that the contractual Time Bar for the cargo claim against Norfolk Southern under [Norfolk Southern's] terms and conditions will not expire until February 2008 and that we are NOT time barred at present," and whether Norfolk Southern had "standard wording for a 'Letter of Assignment' that meets [Norfolk

50

this background, in October 2007, Yang Ming assigned to Nipponkoa any rights Yang Ming might have had against Norfolk Southern for recovery of money pertaining to the destruction of the Enplas Shipment.[30]

After the assignment was executed, Nipponkoa emailed the completed assignment to Norfolk Southern and indicated its belief that the assignment was sufficient to entitle Nipponkoa to payment of $ 118,173.60. Nipponkoa also indicated that it was copying Yang Ming on the email and stated that "[Nipponkoa] and Norfolk Southern will now conclude this case directly." Nipponkoa J.A. 98.

---

Southern's] needs." Nipponkoa J.A. 107 (emphasis omitted). Norfolk responded that "[p]er the Intermodal Circular: claimant has 1 year from date of declination to amend claim," and that "[b]ased on the date of declination, February 2008, [Nipponkoa] is within legal limits to amend the claim." Id. Norfolk also attached an assignment form, asked the claims agent to have Yang Ming execute it, and advised that Norfolk Southern would "proceed with the investigation." Id.

[30] The assignment states: "That Yang Ming America, as agent of Yang Ming Marine Transport . . . does hereby give over and assign to [Nipponkoa], all title interest and rights which it has or may have in any claim or claims against each and every transportation subsidiary of Norfolk Southern Corporation or any other transportation company for the recovery of money or for other redress on account of Yang Ming America, as agent of Yang Ming Marine Transport against the [Enplas Shipment or other shipments] described below." Nipponkoa J.A. 99; Appellee Nipponkoa's Br. at 5-6.

51

As explained above, Nipponkoa's claim for contractual indemnification for damage to the Enplas Shipment was not originally the focus of Nipponkoa's suit. In its motion for reconsideration following remand, however, Nipponkoa asserted its entitlement to indemnification as the assignee of Yang Ming. In opposition, the Railroads argued that in order for Yang Ming, and thus its assignee Nipponkoa, to have a claim for contractual indemnification, Yang Ming must have paid claims related to the damaged freight, which Yang Ming was not alleged to have done. The district court rejected this argument, reasoning that "[n]othing in the ITA . . . requires Yang Ming to first have made a payment on damages related to the Enplas shipment," and that the indemnification provision in question was "broadly worded, holding [Norfolk Southern] liable and Yang Ming harmless for damages to the Enplas shipment." Sompo Japan Ins. Co. of Am., 966 F. Supp. 2d at 281. The district court accordingly granted summary judgment in Nipponkoa's favor on its claim for contractual indemnification.

The Railroads moved for reconsideration of this decision, arguing that Yang Ming had no claim for contractual indemnification to assign because, at the time of the assignment to Nipponkoa, Yang Ming had no potential liability for damage to the Enplas Shipment since, by virtue of the time limit for filing suit

52

specified in the Yang Ming bill of lading, any claim for damages against Yang

Ming would be time barred. The Railroads pointed out that the time limit

provision of the Yang Ming bill of lading specifically provides that "[Yang Ming]

shall be discharged from any and all liability in respect of non-delivery, mis-

delivery, delay, loss or damage unless suit is brought within one year after

delivery of the Goods or the date when the Goods should have been delivered."[31]

Nipponkoa J.A. 77-78. Thus, the Railroads argued, Yang Ming, and therefore its

assignee, could not seek indemnification for damages that Yang Ming had not

incurred, and never would. The district court denied the Railroads' motion for

reconsideration on the ground that they had waived the argument about Yang

Ming's lack of potential liability by failing to raise it earlier, and entered

judgment in favor of Nipponkoa against Norfolk Southern and KCSR.

On appeal, the Railroads argue that the judgment in Nipponkoa's favor

cannot be sustained because at the time Yang Ming assigned its claims to

Nipponkoa, Yang Ming could not have incurred damages for which it would be

entitled to indemnification. Additionally, KCSR argues that the judgment against

it should be vacated because it was not a party to the ITA and therefore had no

---

[31] The parties stipulated that the Enplas Shipment would have been delivered on May 1, 2006.

53

obligation to indemnify Yang Ming.  In opposition, Nipponkoa argues that the

Railroads have either waived or are estopped from making the arguments they

seek to present and that those arguments fail on their merits.[32]

A.  Indemnification

Ordinarily, a claim for contractual indemnification only accrues once the

indemnitee has suffered a loss, i.e., made a payment.  See Cont'l Cas. Co. v.

Stronghold Ins. Co., 77 F.3d 16, 19 (2d Cir. 1996) (stating that a claim founded on

an express contract for indemnity against loss "generally accrues when the

indemnitee actually suffers a loss"); Schneider v. Nat'l R.R. Passenger Corp., 987

F.2d 132, 138 (2d Cir. 1993) ("A party must sustain a loss in order to assert an

indemnification claim.").  Additionally, a claim for indemnification generally will

not lie where the indemnitee has no potential liability requiring indemnification.

See In re Agent Orange Prod. Liab. Litig., 818 F.2d 204, 209 (2d Cir. 1987) ("If

appellants have a valid claim against the Government, [then they also have a

valid Government contractor defense, and] there can be no liability on their part,

potential or actual, against which the Government should be required to

---

[32]  Nipponkoa also argues that the district court's judgment can be affirmed on
the alternative ground that the Railroads should not have prevailed on their
Exoneration Clause defense for the reasons raised in Sompo's appeal.  For the
reasons stated above, we reject that argument.

54

indemnify them."); Atl. Richfield Co. v. Interstate Oil Transp. Co., 784 F.2d 106, 112 (2d Cir. 1986) ("[In The Toledo, 122 F.2d 255 (2d Cir. 1941),] we ruled that the trial court correctly denied the charterer's claim for damages [on its indemnification theory] because it acted as a 'volunteer' when it compensated the cargo owners, since it was not even potentially liable for the delay caused by the latent defect in the crankshaft web."). Nonetheless, because an express contract for indemnity remains a contract, it is ultimately a question of contract interpretation whether the indemnitee is required to make a payment prior to seeking indemnification. See Cont'l Cas. Co., 77 F.3d at 19 ("An express contract for indemnity, however, remains a contract. Hence the parties are free, within limits of public policy, to agree upon conditions precedent to suit.").

We need not decide whether the language of the ITA's indemnification provision somehow removes this case from the purview of those general principles, or whether Yang Ming was even potentially liable to anyone at the time of the assignment, because we conclude that the Railroads have waived the arguments they press on appeal.

The Railroads waived their principal argument – that, by the time of the assignment to Nipponkoa, Yang Ming had been discharged of all liability for

55

damage to the Enplas Shipment by operation of the time bar provision in its bill of lading – because they raised that argument for the first time in their second motion for reconsideration. "Generally, we will not consider an argument on appeal that was raised for the first time below in a motion for reconsideration." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 159 (2d Cir. 2003). While we have discretion to excuse such untimeliness, we see no reason to exercise that discretion in this case. The Railroads argue, however, that they in fact raised this argument prior to their second motion for reconsideration, in opposition to Nipponkoa's motion for summary judgment on remand. Upon review of the Railroads' motion papers before the district court, we cannot agree that the Railroads timely raised the argument they now make on appeal.

Despite the Railroads' efforts to minimize the differences between the argument they made in opposition to Nipponkoa's motion for summary judgment and the argument they made in their second motion for reconsideration, a careful review of the record reveals that those arguments are meaningfully different. In their opposition, the Railroads did *not* argue, as they do now, that Nipponkoa's assigned claim for contractual indemnification failed

56

because Yang Ming (the assignor), having been discharged of liability by virtue of the fact that no entity had filed suit against it within the one year time limit permitted by the bill of lading, could incur no damages, an arguably essential element of a claim for contractual indemnification.

Instead, they made a much more straightforward argument. Specifically, they argued that Nipponkoa's claim *against the Railroads* was time-barred because, under the Yang Ming bill of lading, Nipponkoa was required to file suit within one year of the anticipated delivery of the cargo and, by virtue of the bill's Himalaya Clause, the Railroads were entitled to invoke that time limit to bar Nipponkoa's suit.[33] That argument – an argument about the timeliness of Nipponkoa's suit against the Railroads – is substantively different from the defendants' current argument – an argument about whether Nipponkoa can prove the damages element of its contractual indemnification claim because no

[33] Whatever the merit of that argument with respect to the claims Nipponkoa pursued as subrogee of the cargo owners, it is meritless as pertains to the claim Nipponkoa pursued as assignee of Yang Ming. As Yang Ming's assignee, Nipponkoa stands in the shoes of Yang Ming. The Yang Ming bill of lading expressly provides that nothing in the bill shall be construed to relieve any underlying carrier, such as the Railroads, "from liability to [Yang Ming] for acts arising or resulting from their fault or negligent [sic]." Nipponkoa J.A. 76. In other words, while the bill's Himalaya Clause permits the Railroads to invoke the bill's liability limitations against the cargo owners, it does not permit the Railroads to rely on those limitations against Yang Ming or its assignee.

claim was filed *against Yang Ming* within the limitations period. Because the argument that the Railroads actually made in opposition to Nipponkoa's motion for summary judgment is completely different from the argument they made in their second motion for reconsideration, and press now on appeal, the Railroads' current argument was not properly preserved.

The Railroads also argue, however, that Nipponkoa's claim for contractual indemnification fails because, at the time of the assignment, Yang Ming had incurred no damages, i.e., paid no claims for damage to the Enplas Shipment. That argument was timely raised in opposition to Nipponkoa's motion for reconsideration. Nonetheless, we conclude that to the extent the ITA's indemnification provision can be read as requiring Yang Ming to pay claims before seeking indemnification, Norfolk Southern waived that requirement. While Norfolk Southern might have originally been entitled to insist upon strict compliance with the payment requirement – requiring Yang Ming to first make a payment to the cargo owner's subrogee for damage to the freight and then file a claim for indemnification with Norfolk Southern – we think Norfolk Southern's conduct demonstrated an unequivocal intent not to insist upon such formalities.[34]

---

[34] While the payment prerequisite might be more than a mere formality in some cases, this is not such a case. As the district court correctly held, there is no

See, e.g., Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) ("[A] party to a contract may be precluded from insisting on strict compliance by conduct amounting to a waiver or estoppel." (citing New York law)); Goldstein v. Old Dominion Peanut Corp., 177 Va. 716, 728-29 (1941) ("[C]ovenants and stipulations made by a covenantor for his benefit may be waived by him, either by express terms or by a course of dealing . . . [ and a] covenantor may, by his conduct, so lull his covenantee into a sense of security as thereby to estop himself from the exercise of a right for which he had contracted.").[35]

_____

colorable argument that the freight was not damaged, or that the damage, having been caused by the derailment, is not attributable to the defendants' negligence. In addition, with the exception of the argument that any suit against Yang Ming was time barred – an argument that was waived – there is no good faith contention that if Nipponkoa had sought compensation from Yang Ming, instead of Norfolk Southern, Yang Ming would have had any legitimate basis to deny the claim. Indeed, the Railroads' argument about why the Exoneration Clause in the Yang Ming bill of lading does *not* exonerate the Railroads from liability for their negligence relies on the proposition that the subrogees would be able to recover damages from Yang Ming and that Yang Ming would, in turn, be able to sue the Railroads. Thus, Norfolk Southern's decision not to insist upon the formal payment requirement is entirely understandable, as that decision merely cuts out the middleman, permitting Norfolk Southern to deal directly with the injured party.

[35] On appeal, the Railroads insist that Nipponkoa's claim for contractual indemnification is governed by Virginia law. But in the district court, the Railroads relied on the law of multiple jurisdictions, including New York, in

As set forth in detail above, upon receiving a claim for damage to the Enplas Shipment, Yang Ming communicated that fact to Norfolk Southern and expressed its intent to have Nipponkoa resolve its claim with Norfolk Southern directly.  Norfolk Southern's response is telling.  Rather than object, Norfolk Southern affirmatively provided Nipponkoa with an assignment form, tacitly encouraging Nipponkoa to proceed directly with Norfolk Southern, rather than first obtain a payment from Yang Ming.

Additionally, when Nipponkoa provided the completed assignment to Norfolk Southern and indicated its understanding that the assignment would permit Nipponkoa to resolve its claim with Norfolk Southern directly, Norfolk Southern merely responded that it would investigate the claim.  It gave no hint that Nipponkoa could not resolve its claim with Norfolk Southern directly because Nipponkoa needed to obtain a payment for the damages to the Enplas Shipment from Yang Ming in order for Yang Ming's right to indemnification to arise.

opposition to Nipponkoa's claim.  Furthermore, the Railroads identify no way in which Virginia law differs from New York law, or federal common law, in any material respects.  As the cases cited in the text indicate, we too see no significant difference in the principles applicable under the laws of New York and Virginia.

Norfolk Southern's conduct in the face of Yang Ming and Nipponkoa's expressed intention to have Nipponkoa resolve its claim with Norfolk Southern directly, without having to proceed against Yang Ming first, is inconsistent with any intention on Norfolk Southern's part to insist upon its now-claimed contractual right to a contrary prolonged process.  See, e.g., Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680, 685 (2d Cir. 1983) ("The intention to relinquish a right may be established . . . as a matter of law . . . where the party's undisputed acts or language are so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary." (internal quotation marks omitted)).  Accordingly, because Norfolk Southern waived the alleged contractual requirement that Yang Ming pay for the damages to the Enplas Shipment before its contractual indemnification claim could become viable, that putative requirement does not defeat Nipponkoa's claim.[36]

---

[36]  The Railroads argue that they cannot be estopped from relying on this requirement because Nipponkoa did not rely to its detriment on Norfolk Southern's implicit representation that it would not insist upon it.  We need not address Nipponkoa's estoppel argument since we hold that Norfolk Southern unambiguously waived any contractual right to have Nipponkoa proceed first against Yang Ming.  Reliance is not an element of waiver, which is the intentional relinquishment of a known right.  See Waldman v. Cohen, 125 A.D.2d 116, 122 (2d Dep't 1987) ("Although waiver and estoppel are sometimes used

B. <u>KCSR</u>

Finally, we reject KCSR's contention that judgment should not have been entered against it on Nipponkoa's claim because it was not a party to the ITA, and therefore had no contractual obligation to indemnify Yang Ming. KCSR failed to make this argument at any point before the district court. Furthermore, while the Railroads jointly opposed Nipponkoa's motion for reconsideration and summary judgment, they offered no reason why, if the motion were otherwise meritorious, it should be granted only as to Norfolk and not as to KCSR.[37] Accordingly, KCSR will not now be heard to complain that the district court failed to distinguish between the Railroads when entering judgment on Nipponkoa's claim.

---

interchangeably, a waiver is an intentional abandonment of a right without need to show reliance or detriment to the asserting party.").

[37] While we have discretion to address arguments not presented to the district court where necessary to avoid manifest injustice, we see no reason to do so here. "[T]he circumstances normally do not militate in favor of an exercise of discretion to address . . . new arguments on appeal where those arguments were available to the [party] below and [it] proffer[s] no reasons for [its] failure to raise the argument below."  In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 133 (2d Cir. 2008) (internal quotation marks omitted) (ellipsis in original); see also In re Johns-Manville Corp., — F.3d —, 2014 WL 3583780, at *11 (2d Cir. July 22, 2014) (same).

C.  Conclusion

Because the Railroads' argument for reversal of Nipponkoa's judgment against them are all either waived or without merit, we affirm the judgment in Docket No. 13-3501.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are AFFIRMED.