# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 2, 2018

Lyle W. Cayce
Clerk

No. 17-30543

ROYAL SMIT TRANSFORMERS BV; AXA VERSICHERUNG AG; HDI-GERLING INDUSTRIE VERSICHERUNG AG; BASLER SACHVERSICHERUNG AG; ERGO VERSICHERUNG AG,

   Plaintiffs - Appellants

v.

ONEGO SHIPPING & CHARTERING, BV; ILLINOIS CENTRAL RAILROAD COMPANY; BERARD TRANSPORTATION, INCORPORATED, in personam,

   Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Royal SMIT tried to ship a few of its transformers from the Netherlands to Louisiana. It contracted with an intermediary to arrange the transport. The transformers were damaged along the way, so Royal SMIT and its insurers tried to sue the carriers with whom the intermediary had contracted. But the district court concluded they were precluded from doing so because of a Himalaya Clause in the company's agreement with the intermediary. The court granted summary judgment in favor of the carriers. That decision was appealed, and we affirm.

No. 17-30543

I.

Plaintiff Royal SMIT Transformers B.V. ("Royal") is a company based in the Netherlands that manufactures large power transformers. In November 2015, Royal sold three of its transformers to Entergy Louisiana, LLC, for use at one of its substations in St. Gabriel, Louisiana. The transformers were insured by the co-plaintiffs-appellants AXA Versicherung AG, HDI-Gerling Industrie-Versicherung AG, Basler Sachversicherung AG, and Ergo Versicherung AG.

One month later, Royal contracted with Central Oceans USA, LLC ("Central Oceans") to facilitate the delivery of the three transformers from the Port of Rotterdam to St. Gabriel. The arrangement was established by a multimodal through bill of lading[1] between the parties.

The delivery comprised three legs: ocean transportation from Rotterdam to New Orleans, rail transportation from New Orleans to St. Gabriel, and truck transportation to Entergy's substation. Central Oceans contracted with the defendants to carry out each part of the journey: Onego Shipping & Chartering, B.V. ("Onego") provided the ocean carriage to New Orleans; Illinois Central Railroad Company ("IC") provided rail carriage to St. Gabriel; and Berard Transportation, Inc. ("Berard") provided truck carriage to the final destination.

All of these arrangements were negotiated separately. The defendants were not involved in—nor aware of—the agreement between Central Oceans and Royal, and Royal was not a party to the contracts Central Oceans signed

---

[1] "Multimodal" transport refers to a delivery that entails some combination of air, land, and sea travel. 1 T. Schoenbaum, *Admiralty and Maritime Law*, § 10-4 (5th ed. 2017). A "bill of lading" refers to a document that memorializes the terms of a shipping agreement. *Id.* § 10-11. And a "through bill of lading" refers to a bill of lading that allows cargo owners to contract with an intermediary for a multimodal transportation in a single transaction. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25–26 (2004). The intermediary, in turn, arranges for the transportation with various carriers.

with the defendants. Each defendant negotiated its agreement with Central Oceans independently and memorialized its terms in separate documents.

The terms of the agreement between Royal and Central Oceans were initially set forth in a Request for Transport Quotation ("RFQ") issued by Royal, which incorporated terms from two other documents: a Shipment of Transformers Procedure and a General Terms and Conditions of Purchase. The Terms and Conditions stated that Central Oceans would be held liable "for all cases of loss or damage suffered by [Royal] . . . caused by [Central Oceans's] performance" of the contract. It also anticipated that Central Oceans might subcontract with a third party to perform part of its duties. It warned that Central Oceans was "not release[d] . . . from any obligation or liability" as a result of subcontracting its duty, but was still required to "indemnify [Royal] in full against [resultant liability]." Further, Central Oceans was required to "bind [the] third party fully to the provisions of these terms and conditions." The Terms and Conditions did not, however, specify whether or to what extent the third parties were liable to Royal.

The Purchase Order between the parties noted that "[a]ll services provided" were pursuant to the RFQ, and "expressly den[ied] the applicability of any other terms and conditions." Notwithstanding this provision, the parties then executed the through bill of lading, which stated that its "provisions . . . apply to all claims against [Central Oceans] relating to the performance of the Multimodal Transport Contract."

Like the Terms and Conditions, the bill also anticipated that, as Royal's intermediary, Central Oceans would facilitate the transport by contracting with other entities. Those entities were designated as agents acting on behalf of Central Oceans. Central Oceans, in turn, was liable for their actions:

**10. Basis of Liability**

. . . .

(c) [Central Oceans] shall be responsible for the acts and omissions of his servants or agents when any such servant or agent is acting within the scope of his employment, or of any other person of whose services he makes use for the performance of the Contract, as if such acts and omissions were his own.

The bill of lading limited both the amount and source of Royal's recovery if something went wrong. Specifically, it set a per-package limitation on liability in accordance with requirements set by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701, note § 4(5). And, relevant to the present appeal, it also contained a Himalaya Clause, which prohibited Royal from suing Central Oceans's subcontractors:

**15. Defenses and limits for [Central Oceans], Servants, etc.**

. . . .

(b) [Royal] undertakes that no claim shall be made against any servant, agent, or other persons whose services [Central Oceans] has used in order to perform the Multimodal Transport Contract and if any claim should nevertheless be made, to indemnify [Central Oceans] against all consequences thereof.

(c) However, the provisions of this Contract apply whenever claims relating to the performance of the Multimodal Transport Contract are made against any servant, agent or other person whose services [Central Oceans] has used in order to perform the Multimodal Transport Contract, whether such claims are founded in contract or in tort. In entering into this Contract, [Central Oceans] . . . does so not only on his own behalf but also as agent or trustee for such persons.

The transformers were delivered to the final destination in January 2016, where an inspection revealed that the transformers had been damaged

by "excessive vibration" somewhere along the journey.[2] Royal and its insurers[3] then sued Central Oceans and the defendants on September 12, 2016, for breach of contract, fault, and negligence, seeking over $1,600,000 in damages. Notably, the complaint alleged that "Royal . . . contracted with Central Oceans . . . pursuant to" the through bill of lading. It did not mention the RFQ or Purchase Order.

Central Oceans filed a motion to transfer venue three months later, relying on the mandatory forum selection clause in the multimodal through bill of lading. Royal's opposition again did not contest the applicability of the bill of lading; rather, it was based on convenience to the remaining defendants, who were "not privy to the contractual forum select clause" therein. Royal admitted, in fact, that its "claims against Central Oceans [were] under the" multimodal bill of lading, and it justified its opposition to transfer in part by relying on the bill.

The district court granted the motion in part, severing Royal's claims against Central Oceans and transferring them to the Western District of Virginia. The court noted that "[n]o one disputes the validity of the forum selection clause" in the bill of lading, and that Royal must abide by the terms it negotiated with Central Oceans. The court also concluded that the claims against the defendants could not be transferred because they were not bound by the clause.

The remaining defendants collectively filed a summary judgment motion on April 21, 2017, arguing that they were protected from suit by the Himalaya Clause. In response, Royal submitted an affidavit from Niek Vehreschild, its Strategic Procurement Manager, denying that Royal agreed to this clause.

---

[2] The record does not establish where the damage occurred or which carrier caused it.

[3] For clarity, we will continue to use "Royal" to refer to these entities collectively.

No. 17-30543

Vehreschild asserted, "In engaging Central Oceans . . . for the transportation services at issue . . . [Royal] did not agree to be bound by any contractual terms barring [Royal] from filing any action and seeking recovery for damages sustained to its transformers from any . . . entities involved in their transport." Royal also submitted certain documents received from the defendants during discovery, which outlined the terms of their carrier agreements with Central Oceans.

The district court granted the defendants' motion. Relying on two Supreme Court opinions, *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004) and *Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89 (2010), the court concluded that "actual carriers who fall within the scope of Himalaya Clauses can rely on those clauses to limit their liability." The court also observed that enforcing Himalaya Clauses that shield downstream carriers from liability had become "common practice." Because the defendants fell within the scope of the Himalaya Clause's protection, they could not be sued. Royal timely appealed.

II.

This court reviews grants of summary judgment de novo, applying the same standard as the district court. *Star Fin. Servs., Inc. v. Cardtronics USA, Inc.*, 882 F.3d 176, 179 (5th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant carries its burden, the nonmovant must point to specific evidence that demonstrates a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.

We begin by addressing a preliminary legal question that is not contested by the parties, yet has never been addressed by our court: whether

No. 17-30543

the specific type of Himalaya Clause at issue here is enforceable. We hereby join our sister courts in the Second and Ninth Circuits in concluding that it is. *Cf. Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165 (2d Cir. 2014); *Fed. Ins. Co. v. Union Pac. R.R. Co.*, 651 F.3d 1175 (9th Cir. 2011).

As the Supreme Court has noted, through bills of lading are central to modern maritime commerce, which has embraced "door-to-door transport based on efficient use of all available modes of transportation by air, water, and land." *Kirby*, 543 U.S. at 25 (citation omitted); *see* William Coffey, *Multimodalism and the American Carrier*, 64 TUL. L. REV. 569, 593 (1989) (observing that the through bill of lading is the "dominant instrument of trade"). The through bill allows a cargo owner to arrange for a complex transportation of goods in a single transaction, "rather than [having] to negotiate a separate contract" for each leg. *Kirby*, 543 U.S. at 26; *see also Regal-Beloit*, 561 U.S. at 109. Accordingly, through bills promote efficient contracting—a point of emphasis in this area of law. *See Regal-Beloit*, 561 U.S. at 109; *Kirby*, 543 U.S. at 29.

Himalaya Clauses "extend[] the bills' defenses and limitations on liability to parties that sign subcontracts to perform services contemplated by the bills." *Regal-Beloit*, 561 U.S. at 94. In other words, they operate much like the mountain range by the same name, creating a barrier between the cargo owner and downstream carriers that can be neither scaled nor circumvented.

The Supreme Court has twice enforced Himalaya Clauses in through bills. *See Kirby*, 543 U.S. at 31–32; *Regal-Beloit*, 561 U.S. at 109–10. *Kirby*, in particular, demonstrates the strong protection such Clauses afford. There, the Court held that two different Himalaya Clauses introduced by separate bills of lading within the same multimodal transportation were enforceable. 543 U.S. at 36. The two clauses limited the amount of damages the cargo owner could receive from the intermediary's subcontractors. *Id.* at 32. Despite the fact that

No. 17-30543

the Clauses did not specifically name to whom they applied (instead naming "any servant" of the intermediary), *id.* at 31, and the fact that the cargo owner was not even a party to one of bills, *id.* at 33–34, the Court held that both protected a downstream carrier from the cargo owner.

In *Regal-Beloit*, the Court enforced a Himalaya Clause that afforded a very different protection to downstream carriers: a forum selection clause negotiated between the cargo owner and intermediary. 561 U.S. at 109–10. Applying the terms of the through bill of lading, the Court held that "any suit relating to the cargo" filed by the cargo owner against downstream carriers had to be conducted in Japan, *id.* at 110–11, regardless of any practical difficulties this might cause.

Here, the through bill of lading's Himalaya Clause protects downstream carriers from being sued by Royal. Although it offers a protection distinct from what was provided in *Kirby* and *Regal-Beloit*, we see no reason why the result should be different.

In reaching the same conclusion, both the Second and Ninth Circuits acknowledged a potential pitfall—namely, that such Himalaya Clauses implicate a longstanding policy in maritime law against agreements that improperly limit the recovery to which the cargo owner is entitled. *See Sompo Japan Ins. Co.*, 762 F.3d at 181; *Fed Ins. Co.*, 651 F.3d at 1180. Indeed, COGSA itself states:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter [this note], shall be null and void and of no effect.

8

No. 17-30543

46 U.S.C. § 30701, note § 3(8). As the Supreme Court has observed, this provision was enacted in response to abuses by common carriers that were able to leverage their bargaining advantage over the cargo owner by "insert[ing] clauses in bills of lading exempting themselves from liability for damage or loss . . . and capping any damages awards." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534–35 (1995). Indeed the courts themselves had long before fashioned a similar rule to protect the cargo owner's "unquestioned right . . . to recover full damages from a noncarrying vessel." *United States v. Atl. Mut. Ins. Co.*, 343 U.S. 236, 239–42 (1952).

Both the Second and Ninth Circuits concluded that Himalaya Clauses shielding a common carrier's agents from suit did not run afoul of this general prohibition, though the justifications for this conclusion differed slightly. The Second Circuit observed that the Supreme Court had two major concerns about such clauses: (1) that the cargo owner might not receive full recovery, and (2) that actual carriers would not be properly incentivized to exercise due care. *Sompo Japan Ins. Co.*, 762 F.3d at 182–83 (citing *Atl. Mut. Ins. Co.*, 343 U.S. at 241–42; *Hart v. Pa. R. Co.*, 112 U.S. 331, 340 (1884)). It noted that neither was violated because the Clause does not "exonerate[] a common carrier or its agent from liability for damages caused by their negligence." *Id.* at 182. Instead, it is properly construed as "an ordering mechanism" that "regulate[s] who will be responsible to whom"—specifically, the common carrier to the cargo owner, and the actual carriers to the common carrier. *Id.* at 182–83. Accordingly, the cargo owner would still receive the recovery to which it was entitled (albeit perhaps through more inconvenient means). And the actual carriers, which remain liable to the common carrier for mistakes, would still be incentivized to exercise due care. *Id.*

The Ninth Circuit relied on a single Supreme Court opinion, *Sky Reefer*. *Fed. Ins. Co.*, 651 F.3d at 1179–80. In *Sky Reefer*, the Supreme Court

established a distinction between limitations on liability, which are impermissible in certain cases, and "mechanisms for [the] enforcement" of that liability, which are permissible. *Sky Reefer*, 515 U.S. at 534–35. The Court then concluded the bill of lading's forum selection clause fell into the latter category, despite the fact that it would impose heightened transaction costs on the cargo owner's ability to vindicate its interests. *Id.* at 533–36. The Ninth Circuit, relying on *Sky Reefer*, held that the Himalaya Clause was akin to a forum selection clause—that is, "an enforcement mechanism rather than a reduction of the carrier's obligations to the cargo owner below what COGSA guarantees." *Fed. Ins. Co.*, 651 F.3d at 1180 (quoting *Sky Reefer*, 515 U.S. at 539) (internal quotation marks omitted). Like the Second Circuit, the court acknowledged— and was unaffected by—the fact that the Himalaya Clause might "make it more difficult as a practical matter for [the cargo owner] to recover damages." *Id.*

As the reasoning of our sister courts highlights, the bottom line is this: a Himalaya Clause that protects downstream carriers from suit by a cargo owner does not, in and of itself, limit the cargo owner's ability to receive the recovery to which it is entitled. Here, for example, Royal agreed with Central Oceans to a COGSA-authorized damages limitation. The mere fact that Royal must recover its remedy only from Central Oceans does not prevent it from receiving the full measure of that bargain. Moreover, nothing in the Himalaya Clause precludes Central Oceans from suing the defendants to recoup its losses from Royal. Accordingly, the extension of *Kirby* and *Regal-Beloit* is appropriate. We hold that the downstream carriers are entitled to the protection of such Himalaya Clauses.

## B.

As noted, Royal does not contest this legal conclusion. Instead, Royal contends that the Himalaya Clause was never meant to be enforced. Its

argument is notable for what it does not state. Royal does not contest that the Clause is part of a multimodal through bill of lading, which established other contractual obligations between itself and Central Oceans. It does not contest that the Himalaya Clause, by its clear terms, blocks Royal from suing the Clause's beneficiaries. Nor does Royal contest that the defendants qualify as those beneficiaries.

Instead, Royal argues that there is a material issue of fact as to whether the parties agreed to be bound by the Himalaya Clause within the bill of lading. It cites (1) evidence that allegedly shows Royal neither negotiated nor agreed to the Himalaya Clause and (2) evidence that allegedly suggests the defendants executed other agreements independent of the bill of lading.[4] The district court concluded that neither strand of evidence should impact the enforcement of the Himalaya Clause. We agree.

---

[4] Royal also notes in passing that there is a dispute as to whether Central Oceans should qualify as a freight forwarder or non-vessel operating common carrier ("NVOCC"), which are two types of intermediaries. The defendants assert that Central Oceans is an NVOCC, but Royal points out that Central Oceans referred to itself as a freight forwarder in a letter Royal received.

Both roles serve as middlemen between cargo owners and actual carriers in the negotiation of multimodal transports. Whereas the freight forwarder largely coordinates and organizes the various deals with the carriers, the NVOCC participates as a party to the transactions. *See* 1 Schoenbaum, § 10-7; *compare Constructores Tecnicos, S. de R.L. v. Sea-Land Serv., Inc.*, 945 F.2d 841, 846 (5th Cir. 1991) (defining the freight forwarder role), *with GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 657 (5th Cir. 2017) (defining the NVOCC role).

Admittedly, whether an intermediary participates as a freight forwarder or an NVOCC has some legal significance in other contexts. 1 Schoenbaum, § 10-7 (noting differences in their status as "carriers" under the law). But Royal fails to offer any explanation as to its impact on the interpretation of a through bill of lading, which can be issued by freight forwarders and NVOCCs alike. Michael Crowley, *The Limited Scope of the Cargo Liability Regime Covering Carriage of Goods by Sea: The Multimodal Problem*, 79 TUL. L. REV. 1461, 1462 (2005). Notably, *Kirby* concerned a bill of lading issued by a freight forwarder, 543 U.S. at 19, and *Sompo Japan Insurance Co.*, which relied on *Kirby*, concerned a bill of lading issued by an NVOCC, 762 F.3d at 168, 184. Accordingly, even if Royal's assertion that Central Oceans is a freight forwarder has merit, the dispute is immaterial.

No. 17-30543

1.

As to the former, Royal highlights the Vehreschild affidavit, which asserted that Royal did not intend to be so bound; the provision in its purchase order that expressly denied terms or conditions not contained in the purchase order or RFQ; and specific provisions in the RFQ that, according to Royal, demonstrate that subcontractors were meant to be held liable to Royal. But, again, Royal does not dispute the validity of the through bill of lading itself as a binding maritime contract. Royal's complaint, in fact, asserted that it "contracted with Central Oceans . . . pursuant to" the multimodal through bill of lading.

Particularly in light of these concessions, we discern several problems with Royal's argument. First, this court has long held that, "by filing a lawsuit for damages under the bill of lading, [the party] has accepted the terms of the bill of lading, including . . . unnegotiated" clauses. *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 36 (5th Cir. 1997) (rejecting the party's claim that the bill in question was "a contract of adhesion which it did not negotiate and which therefore should not bind it"). As noted above, Royal's complaint plainly relied on the bill of lading as the basis for its suit, omitting all other documents that memorialized the agreement. And, as noted, Royal has not challenged the validity of the bill of lading itself as a binding agreement. Its attempt to disavow the application of the Himalaya Clause within this agreement because the clause was not part of its negotiations is foreclosed by *Mitsui*.

Furthermore, to the extent that Royal would have us look to extrinsic evidence to discern an intent contrary to the plain text of the bill of lading, basic principles of maritime law governing the interpretation of contracts foreclose such an argument. Specifically, much as for ordinary contract interpretation, we "may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision

12

is ambiguous." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332–33 (5th Cir. Unit A Aug. 1981); *cf. Kirby*, 543 U.S. at 31–32. Further, to the extent a bill of lading's terms differ from prior agreements, the bill of lading supersedes them. *See W. India Indus., Inc. v. Tradex*, 664 F.2d 946, 949–50 (5th Cir. 1981) (noting that parties may agree to terms in a bill of lading that are different from a prior agreement and "thereby make a new and different contract" (quoting *N. Pac. Ry. Co. v. Am. Trading Co.*, 195 U.S. 439, 463 (1904))); 1 T. Schoenbaum, *Admiralty and Maritime Law*, § 10-11 (5th ed. 2017) ("The terms of the bill of lading may supersede an earlier term or agreement negotiated between the parties unless it is specifically preserved in the bill of lading."). Accordingly, insofar as Royal would have us read out a clear provision in the bill of lading based on an affidavit concerning Royal's private intention or conflicting provisions in prior agreements, its argument must be rejected.[5]

Last, we agree with the district court that Royal's argument runs afoul of Supreme Court guidance. A point of emphasis in *Kirby* was the importance of protecting downstream carriers according to the text of through bills of lading. There, the Court applied the terms of a Himalaya Clause protecting a downstream carrier from the cargo owner despite the fact that the through bill of lading was negotiated between the common carrier and another actual carrier higher up in the chain—not the cargo owner. *Kirby*, 543 U.S. at 32–35. Rejecting the cargo owner's argument that it should not be bound by a Himalaya Clause to which it had not agreed, the Court highlighted the complexity of multimodal transactions and the extreme, "even impossible"

---

[5] We add that, contrary to Royal's assertions, there does not appear to be any conflict between the bill of lading and the RFQ. In its sole references to the defendants, the RFQ only requires Central Oceans's agents to abide by its terms. These provisions do not explicitly require that the defendants be liable to Royal. To the contrary, the RFQ merely states that Central Oceans remains liable for their actions. We discern no conflict between the Himalaya Clause and the RFQ's terms.

burden it would place on downstream carriers if they were required "to assure themselves that their contractual liability limitations provide true protection." *Id.* at 35.

The Supreme Court's reasoning looms large here. Royal seeks to override the plain text of *its own* through bill of lading based on private intentions and agreements between Royal and Central Oceans. The defendants were never made privy to either source. Yet, by Royal's logic, downstream carriers should not be able to rely on the plain text of a through bill of lading to which the cargo owner agreed; instead, they must conduct a thorough search for other agreements between the cargo owner and intermediary that might evince contradictory provisions or intent. As the district court noted, such a burden is, if anything, more extreme than what the Supreme Court concluded was untenable in *Kirby*. And it would certainly hinder the underlying policy goal of this area of the law generally and through bills specifically—namely, efficient contracting. *See id.* at 25–26, 29.

We therefore agree with the district court that Central Oceans's arguments seeking to undermine the plain terms of the through bill are irrelevant; the defendants are entitled to rely on that plain text.

2.

Next we consider Royal's citation to documents that allegedly show the defendants did not understand the bill of lading as enforceable "to the exclusion" of their individual agreements. Royal cites documents that record these agreements for support, but have no binding legal authority.[6] Here again, we disagree.

---

[6] Royal also references in passing the defendants' arguments in response to Central Oceans's motion to transfer—i.e., that the bill of lading's forum selection clause did not apply to them because they were not parties to the contract. Royal does not explain what significance—legal or otherwise—this should have. We fail to see why the defendants'

No. 17-30543

The key is Royal's concession that its bill of lading with Central Oceans is a through bill of lading. As noted, through bills have become the "dominant instrument of trade," Coffey, 64 TUL. L. REV. at 593, in international maritime commerce precisely because they allow cargo owners to avoid having to contract separately with actual carriers. *Kirby*, 543 U.S. at 25–26. Instead, that task is passed on to the intermediary, which must coordinate the network of shipping contracts required to complete the delivery. Accordingly, the downstream carriers will come to specific agreements with the intermediary, but these agreements do not, in and of themselves, affect the terms of the Himalaya Clause in the through bill of lading. In other words, the contracts between downstream carriers and an intermediary do not impact the protections negotiated by that intermediary with the cargo owner. *Cf. id.* at 36 (defining—in a far more complex multimodal transport involving numerous, coordinated entities—the downstream carrier's protection from the cargo owner by sole reference to the through bills of lading).

In other words, it is not merely usual, but expected that the defendants would have come to separate arrangements regarding the transportation. And the existence of such agreements does not weaken the binding effect of a Himalaya Clause in applicable through bills of lading. Indeed, allowing such individual agreements to call into question the terms of the through bill of lading would seem to turn the industry practice on its head.

We add that all three of the documents highlighted by Royal are consistent with standard practice. The documents attributed to Berard and IC are copies of their bids to Central Oceans to serve as a carrier to the transport. Similarly, Onego's non-negotiable bill of lading is a common means by which

---

argument concerning a forum selection clause of the bill of lading should preclude or affect their argument that the Himalaya Clause expressly protects them from being sued.

No. 17-30543

downstream carriers memorialize their contracts as part of a multimodal transport. *See* 1 Schoenbaum, § 10-11 (noting that such bills serve as mere receipts, not separate contracts).[7] We decline to deprive the defendants of the Himalaya Clause's protection on this basis.[8]

In short, Royal has again failed to articulate a basis for overriding the clear terms of the through bill of lading.

## III.

The summary judgment is AFFIRMED.

---

[7] Royal's argument that Onego's bill of lading is a separate contract with Royal itself is solely based on the fact that Royal is listed as a "shipper" on the document. To the extent this argument is relevant, its error is clear from the document itself. Central Oceans is listed as the Merchant on a signed page within the same document. That same page includes signatures only from representatives of the Carrier (Onego) and the Merchant (Central Oceans). This is immediately followed by the Conditions of Carriage between the Merchant and Carrier. Onego and Central Oceans are clearly the parties between which the bill of lading was formed. Moreover, Royal admitted in its response to the Defendants' Statement of Uncontested Material Facts that "the Defendants did not sign a contract with Royal."

[8] We also note that the presence of a through bill renders the sole case Royal cites for support—an unpublished district court opinion from another jurisdiction—inapplicable. *See LIG Ins. Co. v. ZP Transport, Inc.*, Civ. A. No. 14-4007, 2015 WL 4725004, at \*4 (N.D. Ill. July 31, 2015) (noting that application of *Kirby* and *Regal-Beloit* was inappropriate because they involved through bills).