RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0375p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

PROGRESSIVE RAIL INC.,

*Plaintiff*,

SIEMENS ENERGY, INC.,

*Plaintiff-Appellant*,

> No. 20-5378

*v.*

CSX TRANSPORTATION, INC.,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:15-cv-00018—Gregory F. Van Tatenhove, District Judge.

Argued: November 19, 2020

Decided and Filed: December 2, 2020

Before: NORRIS, SUTTON, and KETHLEDGE, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Iliaura Hands, NIELSEN & TREAS, LLC, Metairie, Louisiana, for Appellant. Andrew J. Steif, ABEL BEAN LAW P.A., Jacksonville, Florida, for Appellee. **ON BRIEF:** Iliaura Hands, NIELSEN & TREAS, LLC, Metairie, Louisiana, Machale A. Miller, MILLER & WILLIAMSON, LLC, New Orleans, Louisiana, for Appellant. Andrew J. Steif, Kathleen Wubker, ABEL BEAN LAW P.A., Jacksonville, Florida, Rod D. Payne, BOEHL STOPHER & GRAVES LLP, Louisville, Kentucky, for Appellee.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  It took a ship and a train to transport two electrical transformers from Germany to Kentucky.  The ocean leg was uneventful, and the transformers reached Maryland unscathed.  But one of the transformers suffered damage during the inland rail leg to the Bluegrass State.  The rail carrier, CSX, sought shelter under a provision of the original transportation contract that insulated subcontractors from liability.  Because the terms of the contract apply to this dispute, we affirm the district court's decision to grant summary judgment to CSX.

I.

The controversy arises out of an international shipment of two electrical transformers from Bremerhaven, Germany, to Ghent, Kentucky.  Siemens AG, a German company, sells electrical transformers and other industrial manufacturing equipment.  It does business in the United States through a wholly owned subsidiary, Siemens Energy.  K+N International arranges shipping contracts by putting sellers, like Siemens AG, in touch with carriers.  It does business in Germany through a subsidiary, K+N AG, and does business in the United States through another subsidiary, K+N Inc.

In 2011, Siemens Energy, on behalf of Siemens AG, sold two transformers to Gallatin Steel, located in Ghent.  Siemens AG retained freight forwarder K+N AG to make the necessary transportation arrangements.  K+N AG retained Blue Anchor Line, which issued a bill of lading for the trip that provided "the terms of the carriage." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 19 (2004).  Through the bill of lading, Siemens Energy agreed not to sue downstream subcontractors of Blue Anchor Line for any problems arising out of the transport from Germany to Kentucky.

K+N AG subcontracted with K-Line to complete the ocean leg of the transportation.  And Siemens Energy contracted with another K+N entity, K+N Inc., to complete the land leg of the trip from Baltimore to Ghent.  K+N Inc. contacted Progressive Rail, a rail logistics coordinator,

to identify a rail carrier. They settled on CSX, which agreed to complete the trip from Maryland to Kentucky.

During the rail leg from Maryland to Kentucky, one of the transformers was damaged. The problem allegedly cost Siemens Energy more than $1,500,000 to fix.

Progressive Rail filed a lawsuit in 2015 in federal district court in Kentucky against CSX, seeking to limit its liability for these costs. That same year, Siemens Energy filed a lawsuit in federal district court in Maryland against CSX, seeking recovery for the damage to the transformer. The actions were consolidated in the Kentucky federal district court.

The district court granted summary judgment for CSX because the rail carrier qualified as a subcontractor under the Blue Anchor bill and could invoke its liability-shielding provisions. Siemens Energy appeals.

II.

At stake is whether CSX is liable to Siemens Energy for the damaged transformer. There is a simple way to think about the dispute and a more complicated way. Either way, CSX is not liable.

The simple way turns on the terms of the initial transportation contract. Under the contract, the manufacturer agreed to ship the transformers from Germany to Kentucky. The contract accounts for the reality that water and land separate Germany from Kentucky, arranging a trip with segments by ship and by train. And it accounts for the reality that subcontracts would be arranged for each stretch of the trip. Through it all, the contract says that "[t]he merchant undertakes . . . that no claim or allegation shall be made against any Sub-Contractor whatsoever, whether directly or indirectly, which imposes or attempts to impose upon any Sub-Contractor any liability whatsoever in connection with the Goods or the Carriage of the Goods." R.94-3 at 3. Because the contract defines Siemens Energy as a "merchant," it cannot sue a "Sub-Contractor," defined to include "rail . . . transport operators" like CSX. R.94-3 at 3. Thus: CSX is exempt from this lawsuit by Siemens Energy.

That conclusion does not change if we account for some complications—the maritime nature of this contract and the terms of art and statutes that go with it: bills of lading, through bills, multimodal transportation, a Himalaya Clause, a Clause Paramount, the Carriage of Goods by Sea Act, *see* 46 U.S.C. § 30701, the Carmack Amendment, *see* 49 U.S.C. § 11706(a), and so forth.

The parties agree that the Blue Anchor bill of lading is a maritime contract. One objective of the bill after all is to transport goods by sea. *See Kirby*, 543 U.S. at 27. Under the federal common law for interpreting such contracts, as with most contracts, we respect the terms used by the parties in the agreement and give that language a fair reading. *Id.* at 22–23, 31; *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008).

A maritime contract may set the liability rules for an entire trip, including any land-leg part of the trip, and it may exempt downstream subcontractors. Two things are required to accomplish both ends. One is that the contract must amount to a "through bill of lading," which covers "both the ocean and inland portions of the transport in a single document." *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 94 (2010). The other is that the contract must include a "Himalaya Clause," one that extends liability protection to all subcontractors along the way. 46 U.S.C. § 30701 (Notes § 7); *Kirby*, 543 U.S. at 29. A Himalaya Clause, on the off chance you are wondering, takes its name from an English case about the steamship *Himalaya*, not from the far-above-sea-level mountain range. *See Dimond Rigging Co. v. BDP Int'l, Inc.*, 914 F.3d 435, 439 n.5 (6th Cir. 2019).

With both provisions in place, the downstream subcontractor becomes insulated from liability. *See CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339, 361 (6th Cir. 2014); *Fortis Corp. Ins., SA v. Viken Ship Mgmt. AS*, 597 F.3d 784, 792 (6th Cir. 2010). Those are the rules. How do they apply here?

*Is the Blue Anchor bill of lading a through bill*? Yes. In the contract's top-right corner, it refers to the "Multimodal Transport" covered by the bill, hence contemplating sea and land legs. R.94-3. The contract defines multimodal transport to happen when "the Carrier has indicated a place of receipt and/or a place of delivery on the front hereof in the relevant spaces." R.94-3 at

3.   The carrier did just that.   It indicated that Bremerhaven, Germany would be the port of loading, Baltimore, Maryland the port of discharge, and Ghent, Kentucky the "Place of Delivery."   R.94-3 at 1; R.96-9 at 1.   By its terms, the contract gave the parties every reason to "anticipate[] that a land carrier's services would be necessary for the contract's performance"— that it contemplated a multimodal trip, that it indeed was a through bill of lading.   *Kirby*, 543 U.S. at 32.

*Does this through bill of lading exempt CSX from liability*?   Yes.   The bill of lading contains a Himalaya Clause.   It first allows the carrier to "sub-contract" any part of the carriage, including by "rail . . . transport operators" as well as by "any independent contractors, servants or agents employed by the Carrier in performance of the Carriage and any direct or indirect sub-contractors, servants or agents thereof, whether in direct contractual privity with the Carrier or not."   R.94-3 at 3.   It then provides every subcontractor with the "benefit of all provisions . . . benefiting the Carrier," including the covenant not to sue.   R.94-3 at 3.   It then provides that the merchants—defined to include the shipper (Siemens AG) and the consignee (Siemens Energy)— agree that "no claim or allegation shall be made against any Sub-Contractor whatsoever, whether directly or indirectly, in connection with the Goods or the Carriage of the Goods."   R.94-3 at 3. Siemens Energy, a merchant, thus cannot sue CSX, a subcontractor, under the covenant not to sue.

As is their right, the upstream parties extended liability-limiting provisions to downstream rail carriers like CSX, opting to take on the risks of transport (and perhaps insurance) for themselves.   *See Fortis Corp. Ins.*, 597 F.3d at 792; *CNA Ins. Co.*, 747 F.3d at 372.   In the context of a Himalaya Clause like this one, it makes no difference that the downstream carrier was not in privity of contract with either of the Siemens entities.   *Kirby*, 543 U.S. at 34.

Trying to head off this conclusion, Siemens Energy maintains that the Blue Anchor bill of lading is not a through bill.   But if that is the case, why does the bill refer to "multimodal" transportation and to "Ghent, Kentucky"?   In reality, nothing in the text of the Blue Anchor bill helps Siemens Energy's case.   It instead pivots to the claim that extrinsic evidence shows this language was a "glaring administrative error."   Appellant Br. 26.   But we do not use words

discovered through extrinsic evidence to contradict the direct and most reliable evidence of the meaning of a contract: the words within its four corners. *CITGO Asphalt Refin. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1088 (2020); *Royal SMIT Transformers BV v. Onego Shipping & Chartering, BV*, 898 F.3d 543, 551 (5th Cir. 2018). Otherwise, downstream carriers in through bills of lading could not rely on the language of the upstream contracts. *See Kirby*, 543 U.S. at 25–27.

For what it is worth, Siemens Energy never offers cognizable evidence of an error anyway. The sole citation to the record used to support this argument involves the deposition of a K+N Inc. employee. But the individual was not involved in negotiating or drafting the contract, making his statement after-the-fact speculation that a mistake occurred. That does not suffice. "Oops" is not a reason for overriding the terms of a contract. That's especially so when employees of Siemens AG and Siemens Energy reviewed the bill of lading and did not notice any error until this accident occurred.

That CSX issued its own contract for the Maryland-to-Kentucky part of the trip does not alter this conclusion. The original contract referred to the need for downstream subcontracts. What was anticipated thus was needed. And giving the contract its special transportation label— a second bill of lading—hardly makes a difference. It just situates the new bill of lading in the context of the contract, an arrangement for transportation. More than one bill of lading is not unusual. Sometimes they are even duplicative. *See Regal-Beloit*, 561 U.S. at 103–04.

That Siemens AG paid for the ocean leg and Siemens Energy paid for the land leg does not change things either. Why? The method of payment does not alter the method of liability. It was still a multimodal bill of lading and still a through bill of lading.

Siemens Energy says that these transportation arrangements usually work differently. That's a strange argument, for starters, given that *it* was a signatory to the original contract. But even if that is correct, it makes no difference. Sure, *Norfolk South Railway Co. v. Kirby*, 543 U.S. 14 (2004) and *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89 (2010), involved contracts in which the shipping intermediary retained the rail carrier. But that does not mean all transportation agreements use this model. Otherwise, there would be few through bills

of lading from the manufacturer to the buyer.  Nor at any rate is it unusual for subsidiaries of a parent corporation, in this case K+N AG and K+N Inc., to aid one another in carrying out a contract for multimodal transport.  Cooperation between separate and distinct, yet related, subsidiaries is a mainstay of modern contractual arrangements.  *Tenn. Valley Auth. v. Exxon Nuclear Co.*, 753 F.2d 493, 497 (6th Cir. 1985); *see United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 436–37 (1946).

Siemens Energy claims last of all that the covenant not to sue is unenforceable because a federal statute, the Carriage of Goods by Sea Act, guarantees a certain level of recovery.  But it failed to raise the argument below and thus forfeited it here.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).  Several courts have rejected the argument anyway.  *See, e.g.*, *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 183 (2d Cir. 2014); *Royal SMIT Transformers*, 898 F.3d at 549–50; *Fed. Ins. Co. v. Union Pac. R. Co.*, 651 F.3d 1175, 1180 (9th Cir. 2011).

We affirm.